REVISED 5/29/98

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-20109
_____


KENNETH FORD, Dr.,

                                        Plaintiff-Appellee,

                        versus

NYLCARE HEALTH PLANS OF THE
GULF COAST, INC., ET AL.,

                                        Defendants,

NYLCARE HEALTH PLANS OF THE
GULF COAST INC.; NEW YORK
LIFE INSURANCE COMPANY,

                                        Defendants-Appellants.
_____

Appeal from the United States District Court for the
Southern District of Texas, Houston
_____

May 26, 1998

Before JOLLY, WIENER, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

        In this appeal, we consider whether an agreement providing for

the arbitration of all disputes "arising out of or relating to" the

agreement may be invoked to compel arbitration of a cause of action

that does not depend as a legal matter on the agreement.  The

appellants, NYLCare Health Plans of the Gulf Coast, Inc., and its

parent corporation, New York Life Insurance Co., are federally

qualified health maintenance organizations ("the HMOs").[1]  Dr. Kenneth Ford, like many other physician-specialists, entered into an agreement with the HMOs to provide certain medical services to beneficiaries covered under their health plans.  Dissatisfied with the way the HMOs were managing physicians and health care, and with the accuracy of the HMOs' advertising to consumers, Dr. Ford brought this action against the HMOs for, *inter alia*, false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).  Based on the arbitration clause in their agreement with Dr. Ford, the HMOs petitioned the district court to compel arbitration of the lawsuit under the Texas General Arbitration Act ("TGAA") and the Federal Arbitration Act ("FAA").  The district court denied the petition with respect to the false advertising claim, and the HMOs appeal.  We conclude that, under the TGAA, the arbitration clause in the agreement between Dr. Ford and the HMOs does not reach the false advertising claim.  We therefore affirm.

I

A

The facts of this case revolve around the agreement between Dr. Ford and the HMOs.  Dr. Ford, an orthopedic surgeon, signed the agreement in December 1986.  The agreement continues in effect from year to year until either party elects to terminate it.  Neither

_____

[1]NYLCare was formerly known as "Sanus Texas Health Care Plan, Inc."  Throughout this opinion, NYLCare and New York Life will be referred to collectively as "the HMOs."

2

Dr. Ford nor the HMOs have done so, and it remains in effect to this day. Dr. Ford entered into this agreement with the HMOs to provide medical services to those beneficiaries covered by the HMOs' health plan who require the attention of a specialist. In return for these services, the HMOs agreed to compensate Dr. Ford according to a rate schedule maintained by the HMOs. The agreement forbids Dr. Ford from seeking any payment for his services except from the HMOs and, then, subject to their payment procedures and schedules.

As a specialist under the agreement, Dr. Ford is permitted to treat a beneficiary covered by the HMOs' plan only upon proper referral by another physician who has contracted with the HMOs to provide primary care services to that beneficiary. When a specialist like Dr. Ford believes a beneficiary requires the attention of another specialist, referral is permissible only in cases involving "medical emergencies," a term defined by the agreement as the "sudden and unexpected onset of a condition of sufficient seriousness that failure to receive immediate medical or surgical care would jeopardize the life or seriously impair the health of the patient." This requirement may be waived only upon approval by HMO personnel. Even then, the referred specialist must also have contracted with the HMOs and have the referral approved by the primary care physician. "Incentive Withhold Pools" created by the agreement provide that 25% of all payments to primary care physicians and specialists are withheld to pay for medical cost

3

overruns.  The agreement likewise establishes a "Referral Services Pool," from which referral costs are paid.  Annual surpluses in the referral pool are returned to physicians, while annual deficiencies are compensated by drawing funds from the incentive withhold pools.

The agreement also contains an arbitration clause.  It states, in relevant part:

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof shall be settled by arbitration in accordance with the Texas General Arbitration Act, and judgment upon the award rendered may be enforced in any Court of the State of Texas having jurisdiction thereof . . . .  The arbitration proceeding shall be conducted in Harris County, Texas. . . .

The front page of the agreement further states, underlined and in bold type: "NOTICE: THIS AGREEMENT IS SUBJECT TO ARBITRATION UNDER THE TEXAS GENERAL ARBITRATION ACT."  The scope of the arbitration clause is the focus of this litigation.

B

On May 15, 1996, Dr. Ford brought this action against the HMOs[2] based generally on his dissatisfaction with the way the HMOs administered physicians in their provision of health care services and the way the HMOs advertised the benefits of their plan to consumers.  Dr. Ford claimed that these practices constituted false

---

[2]In addition to NYLCare and New York Life, Dr. Ford also sued Aetna Health Plans of Texas, Inc., Aetna Life and Casualty Co., MetraHealth Care Plan of Texas, Inc., MetraHealth Insurance Co., United Healthcare Corp., Travelers Insurance Co., and Metropolitan Life Insurance Co.  These defendants did not have arbitration clauses in their agreements with Dr. Ford and are not parties to this appeal.

advertising under section 1125(a) of the Lanham Act and violated the Texas Insurance Code and Texas Deceptive Trade Practices Act ("TDTPA"). In support of these claims, he alleged that the HMOs make tall promises to consumers about the quality of health care their plan is designed to provide, but that the plan actually results in a reduced quality of care because of medical decision-making by relatively unqualified individuals, burdensome internal procedures, and incentive programs designed to minimize medical costs at the expense of needed health care measures. Rather than using premiums to provide effective health care as promised, Dr. Ford alleged, the HMOs divert needed funds to fill "overflowing corporate coffers" and to pay "bloated executive salaries." Dr. Ford also alleged claims for tortious interference with business relations, negligence, negligent misrepresentation, fraud, breach of good faith and fair dealing, unjust enrichment, and a right to an accounting. Because the HMOs had entered agreements similar to Dr. Ford's with many other specialist-physicians,[3] Dr. Ford sought to bring these claims in a class action on behalf of himself and all other specialist-physicians who had contracted with the HMOs under a managed care plan.

The HMOs filed a motion to dismiss Dr. Ford's claims and a petition to compel arbitration. On January 3, 1997, the court

---

[3]At oral argument, the HMOs confirmed that the agreements they maintained with other physicians were "virtually identical" to Dr. Ford's.

5

dismissed the claims based on the Texas Insurance Code, the TDTPA, negligence, negligent misrepresentation, unjust enrichment, and the right to an accounting. The court then ordered arbitration of the claim for breach of the duty of good faith and fair dealing. It refused, however, to compel arbitration of the false advertising and tortious interference claims. The court reasoned that these claims would exist in the absence of the agreement between Dr. Ford and the HMOs and, therefore, did not arise out of or relate to that agreement. The court did not specify whether federal or state law governed its analysis. The HMOs appeal this order. They contend that although the district court basically employed the correct test to determine whether those claims were arbitrable, it applied the test incorrectly. Based on the allegations in Dr. Ford's complaint, the HMOs argue, the false advertising and tortious interference claims are related to the agreement between the parties and thus come within the scope of the arbitration clause.

Dr. Ford, in an effort to better limit the case to an easily definable class action, has since agreed to send the tortious interference claim to arbitration.[4] Thus, we consider only the arbitrability of the false advertising claim in this appeal. "Resolving this dispute is a matter of contract interpretation and

---

[4]Dr. Ford explained at oral argument that he limited the action to physicians who had contracted with the HMOs solely to assure an easily identifiable list of plaintiffs for whom the HMOs could provide telephone numbers and addresses.

therefore is subject to *de novo* review by this court." <u>Neal v. Hardee's Food Sys., Inc.</u>, 918 F.2d 34, 37 (5th Cir. 1990).

II

Ordinarily, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 (1985). And, ordinarily, "[t]he court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the FAA.'" <u>Id.</u> (citations omitted). The arbitration clause in the agreement between Ford and the HMOs in this case, however, states that controversies would be subject to arbitration in accordance with the Texas General Arbitration Act. This provision is significant evidence that the parties intended the scope of the clause to be determined according to Texas law. Citing <u>Atlantic Aviation, Inc. v. EBM Group, Inc.</u>, 11 F.3d 1276 (5th Cir. 1994), the HMOs argue that such references to Texas law are irrelevant because, even if the parties had chosen Texas law to govern arbitration, the FAA preempts any otherwise applicable state law if the agreement involves commerce.[5]

A

---

[5]The parties apparently agree that the agreement here involves commerce.

7

We will consider as a threshold matter, therefore, whether parties may designate state law to govern the scope of an arbitration clause in an agreement otherwise covered by the FAA. Clearly, they can. The federal policy underlying the FAA "is simply to ensure the enforceability, *according to their terms*, of private agreements to arbitrate." Volt Information Sys., Inc. v. Board of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989) (emphasis added). Indeed, the FAA was specifically designed to place arbitration agreements "'upon the same footing as other contracts.'" Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-11 (1974) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). And, "as with any other contract, the parties' intentions control" the ultimate interpretation of an arbitration clause. Mitsubishi, 473 U.S. at 626. For "[a]rbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." Volt, 489 U.S. at 479; see also Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, AFL-CIO, 370 U.S. 254, 256 (1962) ("the issue of arbitrability is a question for the courts and is to be determined by the contract entered into by the parties"); Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 709 (7th Cir. 1994) (Posner, C.J.) ("short of authorizing trial by battle or ordeal or, more doubtfully, by a panel of three monkeys, . . . parties are as free to specify idiosyncratic terms

8

of arbitration as they are to specify any other terms in their contract").

Applying these principles, the Supreme Court has recognized that parties may use choice-of-law provisions to designate state law to provide the procedural rules under which arbitration will be conducted. See Volt, 489 U.S. at 476. In Volt, the parties had entered into an agreement with a general choice-of-law clause providing that the agreement be governed by the law of the place where the subject of the agreement was located, which in that case was California. See id. at 470. The issue was whether a procedural rule in the California Arbitration Act, not available under the FAA, should be interpreted to apply to the arbitration agreement. The Court held that it should, stating:

> Just as [the parties] may limit by contract the issues which they will arbitrate, . . . so too may they specify the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward.

Id. at 479. As the above-quoted passage demonstrates, the Court expressly analogized the parties' freedom to limit contractually the scope of the arbitration clause with their freedom to select the rules under which arbitration will be conducted. It follows, then, that if the parties may select the rules of arbitration through the use of choice-of-law provisions, so too may they specify the law governing interpretation of the scope of the

9

arbitration clause. Indeed, we think that to disregard the parties' choice of law in this respect "would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms." Id.[6]

Consequently, the issue we must address here is whether the parties intended state law to govern the scope of their agreement to arbitrate. If the agreement between Dr. Ford and the HMOs demonstrates their intent to have the scope of the arbitration clause determined by Texas law, we must respect that choice. Only

---

[6]The HMOs' reliance on our decision in Atlantic Aviation for the proposition that substantive federal law governs the scope of an arbitration clause whenever the agreement involves commerce is misplaced. That case concerned whether parties could invoke a choice-of-law provision to limit the jurisdiction of federal courts to hear the appeal of an order vacating an arbitration award and directing a rehearing. See 11 F.3d at 1279. The jurisdiction of the federal courts is generally a matter for Congress to decide, not private parties or state law. Recognizing this principle, the court held that "the FAA governs judicial review of arbitration proceedings notwithstanding any choice of law provision or state law to the contrary." Id. at 1280. The court did not, however, extend its reasoning beyond the issue of jurisdiction. Compare, e.g., Gateway Tech., Inc. v. MCI Telecomm. Corp., 64 F.3d 993, 996-97, 997 n.3 (5th Cir. 1995) (upholding parties' contractual choice to expanded review of the arbitration award by federal courts). Thus, Atlantic Aviation does not control the case before us. Although parties cannot use a choice-of-law provision to divest federal courts of jurisdiction, this limitation does not prevent parties from selecting state law to govern the scope of their agreement to arbitrate. And although Atlantic Aviation relied in part on earlier cases suggesting that the involvement of commerce under the FAA was dispositive with respect to the law governing arbitrability even where the parties contemplated state law to apply, see, e.g., Mesa Operating Ltd. Partnership v. Louisiana Interstate Gas Corp., 797 F.2d 238 (5th Cir. 1986), those cases did not survive Volt, which, as discussed above, expressly held otherwise. Atlantic Aviation, decided five years after Volt, should not be read to revive these cases in any way.

10

by rigorously enforcing arbitration agreements according to their terms, do we "give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind the FAA." Volt, 489 U.S. at 479.

B

We thus consider the agreement between Dr. Ford and the HMOs to determine whether the parties contemplated Texas law to govern the scope of the arbitration clause. We begin with the arbitration clause itself, focusing on whether any choice-of-law provision in the clause is relevant to the issue at hand. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 64 (1995) (holding that choice-of-law provision in arbitration clause covered arbitration, while general choice-of-law clause in contract covered the other rights and duties of the parties). The clause in this case states that arbitration of any claim must be settled "in accordance with the Texas General Arbitration Act." On its face, this provision would seem to designate the TGAA as the law governing all aspects of arbitration under the agreement. Although the HMOs proposed at oral argument that the provision could be read to make the TGAA applicable only to the procedural aspects of arbitration, they conceded that nothing in the arbitration clause supported such limited application. Nor does anything in the TGAA suggest that it would not apply to issues such as the scope of the arbitration clause. It consists of more than procedural rules. Like the FAA, the TGAA contains substantive provisions governing both the

11

validity and enforceability of arbitration agreements. <u>See, e.g.</u>, Tex. Civ. Prac. & Rem. § 171.001. The HMOs simply furnish no reason to believe that Texas law and the TGAA apply to anything less than every aspect of arbitration under their agreement with Dr. Ford.

Nothing in the remainder of the arbitration clause or the body of the agreement indicates otherwise. The arbitration clause goes on to provide that any arbitration proceedings under the agreement "shall be conducted in Harris County, Texas." Judgment upon any arbitration award may be enforced only in a "Court of the State of Texas having jurisdiction thereof." Disagreements over arbitrators are to be resolved by "any judge of any Court of the State of Texas, having jurisdiction and located in Harris County." As for the main body of the agreement, the first page announces in bold type: "<u>NOTICE: THIS AGREEMENT IS SUBJECT TO ARBITRATION UNDER THE TEXAS GENERAL ARBITRATION ACT</u>." The rest of the agreement contains only general references to other applicable laws. The first page notes that physicians must provide or arrange for basic health care services as required by what the agreement defines as the "HMO Laws": the Health Maintenance Organization Act of 1973, 42 U.S.C. §§ 300e, *et seq.*, and the Texas Health Maintenance Organization Act, Tex. Ins. Code ch. 20A. Finally, in a general choice-of-law clause of sorts, the agreement provides that it "shall be governed in all respects by the HMO Laws and any other applicable laws or regulations."

12

Examining the agreement as a whole, we are persuaded that the parties intended Texas law and the TGAA to govern the scope of the arbitration clause. The clause itself specifies that arbitration is to be governed by the TGAA. Other provisions in the arbitration clause lean heavily in favor of applying Texas law to determine the arbitrability of disputes under the agreement. Nothing else in the agreement suggests that the parties intended federal law or the FAA to apply. Indeed, the only provision in the entire agreement possibly making a law applicable to arbitration other than Texas law can, at best, be characterized as an extremely general choice-of-law clause. And it, in relevant part, simply makes the unremarkable observation that the agreement generally is governed by all applicable laws or regulations.

Finally, to the extent that the general choice-of-law clause could conceivably be read to create an ambiguity, we construe ambiguous contract language against the party who drafted it. See Mastrobuono, 514 U.S. at 62 (applying the common law rule to interpretation of arbitration clauses). If the HMOs drafted an ambiguous document, they cannot now claim the benefit of the doubt. "The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result." Id. at 63. As in Mastrobuono, "[t]hat rationale is well-suited to the facts of this case." Id. Thus, we hold that Texas law and the TGAA govern the scope of the arbitration clause in this case.

III

13

Having determined that the arbitrability of Dr. Ford's false advertising claim is governed by Texas law and the TGAA, we turn now to interpret the scope of the arbitration clause under Texas law.  Texas courts favor arbitration.  Monday v. Cox, 881 S.W.2d 381, 384 (Tex. App. 1994).  Whether a claim falls within the scope of an arbitration agreement under Texas law depends on the factual allegations of the complaint instead of the legal causes of action asserted.  See X.L. Ins. Co., Inc. v. Hartford Accident & Indem. Co., 918 S.W.2d 687, 689 (Tex. App. 1996, writ requested).  A tort claim, like Dr. Ford's false advertising claim, see Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 700-01 (5th Cir. Unit A Oct. 1981) (false advertising claims under Lanham Act are based on the common law tort), is arbitrable if it is "so interwoven with the contract that it could not stand alone, but is not arbitrable if it is completely independent of the contract and could be maintained without reference to a contract."  X.L. Insurance Co., 918 S.W.2d at 689; accord Valero Energy Corp. v. Wagner & Brown, 777 S.W.2d 564, 566 (Tex. App. 1989, writ denied).

A

The HMOs contend that the allegations in the complaint supporting Dr. Ford's false advertising claim are interwoven with the agreement sufficiently to make the claim arbitrable, even under Texas law.[7]  In particular, the HMOs cite Dr. Ford's allegations

---

[7]We agree with the HMOs that there is no perceptible difference between the federal and Texas standards in this respect.

14

that the HMOs promise consumers "cost effective and high quality health care" but instead provide a "labyrinthine system that ultimately denies effective health care" by constructing elaborate payment systems designed to discourage physicians from providing necessary care and by rejecting physician-recommended procedures. The HMOs further cite Dr. Ford's allegations of a reduced quality of care resulting from the referral systems and financial incentive pools established in the agreement. The HMOs argue that although Dr. Ford certainly could have stated a false advertising claim without referencing the agreement in the factual allegations of his complaint, he did not. Thus, they conclude, his false advertising claim cannot exist without the agreement.

The HMOs' argument, we think, fundamentally misconceives the test for whether a tort claim is sufficiently related to the agreement to be arbitrable. To be sure, the test focuses on the factual allegations in the complaint instead of the legal labels attached to the causes of action. See X.L. Insurance Co., 918 S.W.2d at 689. It does so, however, not to identify whether the facts in support of the action will implicate the agreement as an item of evidence, but to uncover whether an action formally labeled

Whether described as "touch[ing] matters covered by" the agreement, see Mitsubishi, 473 U.S. at 624 n.13, or "interwoven with" the agreement, see X.L. Insurance Co., 918 S.W.2d at 689, a tort claim is "related to" the agreement only if reference to the agreement is required to maintain the action. This is true notwithstanding the fact that the tort claim may implicate the agreement as a factual matter.

15

a tort is in essence a breach of contract claim or based on a breach of contract. See, e.g., Valero Energy Corp., 777 S.W.2d at 566 ("[The plaintiff] here is asserting a tort claim that is directly related to its rights under the contract. It could have just as easily alleged a breach of contract action under the fact situation presented."). Because a breach of duty owed under a contract may involve tortious conduct, a dispute arising out of a contractual relationship may give rise to both breach of contract and tort claims at the same time. See id. Basing the arbitrability of an action merely on the legal label attached to it would allow artful pleading to dodge arbitration of a dispute otherwise "arising out of or relating to" (or legally dependent on) the underlying contract. To avoid this contrivance, courts look at the facts giving rise to the action and to whether the action "*could be* maintained without reference to the contract," id. (emphasis added), not, as the HMOs contend, to whether the complaint happens to reference the contract.

A couple of Texas cases directly illustrate the point. For example, in Fridl v. Cook, 908 S.W.2d 507 (Tex. App. 1995, writ dismissed w.o.j.), the court considered the arbitrability of various tort claims under an arbitration clause essentially mirroring the one in Dr. Ford's agreement. The plaintiff alleged claims based on fraud and tortious interference with contract. Because the complaint referenced the contract between the plaintiff and defendants, the defendants argued that the claims were

16

arbitrable because they "related to" the contract. The court rejected the argument. With respect to the fraud claim, the court stated:

> We do not see that this is a claim "arising out of or relating to" the contract. [The defendants] may have honored their contractual obligations in every respect, and yet be liable for fraudulently inducing [the plaintiff] to obtain business outside the contract so as to avoid full payment of commissions. We believe this claim is distinguishable from the fraud claim which this Court found subject to arbitration in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wilson, 805 S.W.2d 38, 40 (Tex. App.--El Paso 1991, no writ). There, Merrill Lynch could not be liable for fraud unless it had breached its obligations under the brokerage contract with Wilson, its client. Here, the fraud claim may be pursued even if no breach of the [] contract occurred. . . .

Id. at 513. The court also applied this same analysis in holding that the tortious interference claim did not fall within the scope of the arbitration clause. Examining the legal elements of a tortious interference claim, the court concluded that the existence of the contract between the plaintiff and defendants was unnecessary to establish the claim. See id. The fact that the complaint specifically referred to, and related as a factual matter to, the contract containing the arbitration clause was irrelevant. The tort action did not depend, *as a legal matter*, on the contract and, therefore, was not "related to" the contract within the meaning of the arbitration clause.

Similarly, in Heartshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co., 849 S.W.2d 380 (Tex. App. 1993, writ denied), the court refused to compel arbitration of a tort claim that was

17

legally independent of the contract containing the arbitration agreement. Again, the relevant arbitration clause provided for arbitration of any dispute "arising out of or relating to" the contract between the parties. See id. at 383. The plaintiff alleged that it had entered the contract with the defendant-- involving a "Gardens" project--only because it had been promised another project--involving the "Landing." See id. at 391. The plaintiff advanced several tort claims against the defendant in connection with the Landing project. Holding that these claims were not arbitrable, the court observed that the plaintiff "need not even refer to the contracts involving the Gardens in order to maintain the claims regarding the Landing." Id. Thus, Heartshire demonstrates that the test for whether a tort claim "relates to" a contract depends on whether the claim *could be* maintained without reference to the contract, not simply whether the complaint references the contract.

B

Applying this test to Dr. Ford's false advertising claim, we conclude that it does not arise out of or relate to his agreement with the HMOs. The basic elements Dr. Ford must allege to sustain a false advertising claim are: (1) that the HMOs made a false or misleading statement as to their services; (2) that there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised

18

services involve interstate commerce; and (5) that there is a likelihood of injury to Dr. Ford.  See Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1383 n.3 (5th Cir. 1996).[8]  None of these elements depends, as a legal matter, on the agreement between Dr. Ford and the HMOs.

As the district court correctly determined, Dr. Ford could maintain this action without reference to the agreement.  The action is based on the manner in which the HMOs advertised their services to consumers.  The competitive injuries alleged by Dr. Ford come in the form of patients and revenue lost as a result of consumers being misled into participating in the HMOs' health plan instead of going directly to the doctor of their choice and seeking reimbursement through the traditional health insurance route.[9]  Dr. Ford clearly would suffer the same injuries regardless of the agreement or a breach thereof.  Although the policies, practices, and procedures implemented by the HMOs, as they appear in the terms of the agreement, would undoubtedly be relevant evidence in support

---

[8]Section 43(a) of the Lanham Act provides, in relevant part:

> Any person who . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).

[9]Dr. Ford, like the other doctors providing services under the HMOs' plan, maintains a private practice outside his relationship with the HMOs.

of Dr. Ford's claims (*e.g.*, to show that the HMOs use procedures resulting in care different from that advertised), this evidence could likewise be established with witness testimony and documents, which exist independent of the agreement.  In other words, the fact that an agreement exists between Dr. Ford and the HMOs is legally irrelevant and indeed can be treated as nonexistent as far as his false advertising claim is concerned.  In fact, the agreement will likely play, even as a purely evidentiary matter, a very minor role in the ultimate litigation of Dr. Ford's false advertising claim. Thus, we hold that Dr. Ford's false advertising claim does not arise out of or relate to his agreement with the HMOs and, therefore, is not subject to the agreement's arbitration clause.

IV

For the foregoing reasons, the judgment of the district court is

A F F I R M E D.