# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 30, 2021

Lyle W. Cayce
Clerk

No. 20-20416

Polyflow, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Specialty RTP, L.L.C.; John R. Wright, Jr.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-683

Before Jones, Clement, and Graves, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

Polyflow appeals the district court's order denying its motion to compel arbitration with Specialty RTP and its president John Wright. Polyflow claims that Specialty and Wright violated a 2017 Settlement Agreement between the parties, which included a clause requiring arbitration of "any action arising out of" the agreement. Nevertheless, the district court denied Polyflow's motion to compel arbitration in a single-sentence order without analysis. That was error. Applying the strong presumption in favor of arbitrability, we reverse and remand with instructions to order arbitration.

No. 20-20416

I.

A.

Polyflow manufactures a proprietary pipe called Thermoflex that it sells and installs for customers in the oil and gas industry. John Wright was Polyflow's president from the company's beginning in April 2011 until he resigned in October 2014 to form a competitor, Specialty RTP. In 2015, Polyflow sued Specialty RTP and Wright (collectively, "Specialty") for a host of abuses, including that Specialty allegedly manufactured a pipe identical to Thermoflex and derived from Polyflow's protected and confidential information. In February 2017, the parties settled that suit via the Settlement Agreement.

The meat of that agreement imposed a two-year limitation on Specialty's ability to manufacture any competing pipe of its own but allowed Specialty to purchase pipe from existing vendors. During and after that two-year manufacturing ban, the agreement imposed further limitations on Specialty's use or disclosure of Polyflow's trade secrets. So long as Specialty honored those restrictions, it remained free to independently design and manufacture a competing product. As a safeguard, the parties agreed to hire a neutral pipe expert to inspect Specialty's proposed pipe, compare it with Polyflow's, and adjudicate whether Specialty was, in fact, independently designing its own product.

The agreement specified that the parties would engage the neutral expert from the effective date of the agreement in February 2017 until Christmas Eve 2019. Then, after that end date, the parties agreed to retain the expert to mediate any disputes, unless they mutually agreed to other mediation.

The Settlement Agreement included an arbitration clause, in paragraph C.4, entitled "Governing Law, Arbitration and Jury Waiver." It

2

said: "The sole and exclusive jurisdiction and venue for any action arising out of this Agreement shall be an arbitration in Harris County, Texas." Additionally, the section of the agreement describing the neutral pipe expert, paragraph B.5.c, also addressed arbitration. There, the parties agreed that, if the expert (or another mediator) could not resolve any dispute, an arbitrator would "render a binding, unappealable decision regarding the Parties' dispute(s)." The agreement added: "For purposes of clarity, the Parties are agreeing that any disputes arising out of or related to this Agreement will be arbitrated and not litigated in a court of law. . . ."

## B.

In September 2019, Polyflow gave notice to Specialty and to the neutral pipe expert that it was "terminating immediately" the expert, and that Polyflow would "no longer work with" the expert "under the terms of the Settlement Agreement." In that termination letter, Polyflow claimed that the expert had breached his neutrality by writing a letter on behalf of Specialty that the expert knew "would be used to interfere in Polyflow's existing contractual relationship with [a] customer." Polyflow also claimed that the expert had failed to follow the process specified in the agreement in that he "never asked Polyflow for any information on prior projects submitted by Specialty."

On the same day that Polyflow sent the termination letter to the expert, it sent Wright an arbitration demand alleging fraudulent inducement, breach of the Settlement Agreement, trademark infringement, and other federal and Texas statutory and common law violations.

When Specialty resisted arbitration, Polyflow filed this lawsuit in February 2020. Polyflow's original complaint included just two counts: requests for an order compelling Specialty to arbitrate and for an order appointing an arbitrator. Polyflow followed that with a First Amended

Complaint ("FAC"), which added seven substantive counts substantially like those in Polyflow's arbitration demand from the previous September. In its FAC, Polyflow said that it "primarily seeks to compel arbitration as set forth in Counts One and Two, but to the extent that the Court finds any of the affirmative causes of action should not be sent to arbitration, alternatively affirmatively asserts, as applicable, Counts Three through Nine."

Specialty moved to dismiss, and Polyflow moved to compel arbitration and to dismiss Specialty's counterclaims. The district court denied Polyflow's motion to compel arbitration without explanation, and Polyflow filed this interlocutory appeal. Our review is de novo. *Bowles v. OneMain Fin. Grp.*, 954 F.3d 722, 725 (5th Cir. 2020).

## II.

We first consider federal court jurisdiction, which Specialty disputes for the first time on appeal. Polyflow concedes that there is no diversity jurisdiction but maintains that the case presents a federal question. *See* 28 U.S.C. §§ 1331–32. We agree.

In *Vaden v. Discover Bank*, 556 U.S. 49 (2009), the Supreme Court explained the jurisdictional analysis in arbitrability disputes like this one. By way of background, the Court addressed a jurisdictional oddity in the Federal Arbitration Act, 9 U.S.C. §§ 1–16. On one hand, the Act established "a national policy favoring arbitration of claims that parties contract to settle in that matter," and § 4 of the Act created the means to enforce an arbitration demand in the federal courts. *Id.* at 58 (internal quotations and citations omitted). Indeed, § 4 provides a federal-court remedy in arbitration disputes:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, . . . for

an order directing that such arbitration proceed in the manner provided for in such agreement.

But *Vaden* then went on to point out a wrinkle. "As for jurisdiction over controversies touching arbitration, however, the Act is something of an anomaly in the realm of federal legislation: It bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute." *Vaden*, 556 U.S. at 59 (cleaned up).

Thus, based upon the text of § 4, which instructs courts to "assume the absence of the arbitration agreement and determine whether it would have jurisdiction under title 28 without it," the Court endorsed a "look through" jurisdictional analysis. *Id.* at 62. (internal quotations omitted). When an arbitration demand is predicated on federal-question jurisdiction, as in this case, the "court may 'look through' a § 4 petition to determine whether it is predicated on an action that 'arises under' federal law," as required by 28 U.S.C. § 1331. *Id.* That "look through" analysis does not depend upon the petition's strict language, but upon "the controversy" or "substantive conflict between the parties." *Id.* at 62–63. "If 'looking through' to the claims involved in the underlying dispute . . . shows that the dispute itself . . . could have been brought in federal court, then federal jurisdiction lies over the FAA petition." *Badgerow v. Walters*, 975 F.3d 469, 473 (5th Cir. 2020) (quoting *Vaden*, 556 U.S. at 62), *petition for cert. filed*, No. 20-1143 (Feb 12, 2021).

Under that "look through" analysis, we hold that this underlying dispute presents a federal question. Polyflow's arbitration demand included at least three federal statutory claims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125. Against that fact and the *Vaden* analysis, Specialty's argument that Polyflow did not plead the federal claims until its FAC is unconvincing. What matters is that a federal question—the Lanham Act claims—animated the underlying dispute, not whether Polyflow listed them

in its original complaint. As we have said, *Vaden* "rejected the standard articulation of the well-pleaded complaint rule ordinarily used to analyze federal jurisdiction," and substituted instead, "the so-called 'look through' approach." *Quezada v. Bechtel OG & C Constr. Servs.*, 946 F.3d 837, 841 (5th Cir. 2020). Satisfied of our jurisdiction, we move on.

## III.

Our arbitrability analysis is well settled. "First, the court must determine whether the parties agreed to arbitrate the dispute." *Will-Drill Res. v. Samson Res.*, 352 F.3d 211, 214 (5th Cir. 2003) (citation omitted). That question involves two considerations: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (citation omitted). If the court finds that the parties agreed to arbitrate, the court typically "must consider whether any federal statute or policy renders the claims nonarbitrable." *Id.* (citation omitted).

Here, though, Specialty does not dispute that there is a valid agreement. Therefore, we consider only whether the parties' dispute is covered by the agreement. We begin with a review of the contract language itself and then conduct a claim-by-claim review. Finally, we address Specialty's alleged defenses.

## A.

"[A] disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). "When deciding whether the parties agreed to arbitrate the dispute in question, 'courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'" *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir. 1996) (quoting *First Options of Chi. v. Kaplan*, 514 U.S. 938, 944

(1995)). In doing so, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–46 (1989); *Webb*, 89 F.3d at 258.

In other words, if the parties have contracted to arbitrate, there is a "presumption" that their disputes "will be deemed arbitrable unless it is clear that the arbitration clause has not included them." *First Options*, 514 U.S. at 945 (internal citations and quotations omitted). This is so because "when the parties have a contract that provides for arbitration of some issues," courts recognize that "the parties likely gave at least some thought to the scope of arbitration." *Id.* "And, given the law's permissive policies in respect to arbitration . . . the law . . . insist[s] upon clarity before concluding that the parties did *not* want to arbitrate a related matter." *Id.* (citations omitted). Specialty, as "the party resisting arbitration[,] shoulders the burden of proving that the dispute is not arbitrable." *Overstreet v. Contigroup Cos.*, 462 F.3d 409, 412 (5th Cir. 2006).

Following those "ordinary state-law principles," *Webb*, 89 F.3d at 258, we begin with the language of the contract. Paragraph C.4 says that "any action *arising out of* this Agreement shall be an arbitration in Harris County, Texas." And paragraph B.5.c says: "For purposes of clarity, the Parties are agreeing that any disputes *arising out of or related to* this Agreement will be arbitrated and not litigated in a court of law. . . ."

We conclude that this is an action or a dispute arising out of or related to the Settlement Agreement. Polyflow accuses Specialty of "continu[ing] to use Polyflow information and materials" to "compete unfairly with Polyflow," in violation of the Settlement Agreement. Polyflow lists Specialty's specific violations "less than a month after signing" the agreement. Count One of the arbitration demand accuses Specialty of

making material misrepresentations that fraudulently induced Polyflow to enter into the Settlement Agreement.[1]  Count Two alleges a material breach of the Settlement Agreement.  And the remaining counts in the arbitration demand incorporate those allegations into common law and statutory claims.  So too with the counts in the FAC.

The weight of our precedent supports the finding that paragraph C.4 is a "broad" arbitration clause that encompasses these claims.  *See Explo v. S. Nat. Gas Co.*, 788 F.2d 1096, 1098–99 (5th Cir. 1986) (comparing "narrower 'arises under' language" with "broader 'arising out of' language"); *Sedco v. Pemex*, 767 F.2d 1140, 1144 n.8, 1145 (5th Cir. 1985) (holding that clause with "arising out of" language is "broad"); *The Rice Co. (Suisse) v. Precious Flowers*, 523 F.3d 528, 532 (5th Cir. 2008) (same); *see also* 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy *arising out of* . . . a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (emphasis added)).

To be sure, in *Pennzoil Exploration v. Ramco Energy*, 139 F.3d 1061, 1067 (5th Cir. 1998), we distinguished the "broad" arbitration clauses at issue there from "arising out of" clauses that we described as narrow.  But that classification in *Pennzoil* was in dicta; it opined on contract language not at issue in the case.  *See id.*  Moreover, *Pennzoil* stands alone in this court's jurisprudence compared to our consistent "broad" holdings both before and after.

---

[1] Polyflow alleges fraudulent inducement of the contract generally, not of the arbitration provision.  The distinction can be important because of its impact on the court's ability to adjudicate the question.  *See Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403–04 (1967); *Dillard v. Merrill Lynch*, 961 F.2d 1148, 1154 n.9 (5th Cir. 1992).  Since it is not in issue, the court need not explore *Prima Paint*'s distinction.

We hold that the arbitration language in paragraph C.4 is broad. Similarly, the language in B.5.c is assuredly a "broad arbitration clause[] capable of expansive reach." *Pennzoil*, 139 F.3d at 1067; *see Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 398 (1967) (characterizing "arising out of or relating to" language as a "broad arbitration clause").

Specialty's arguments to the contrary are simply unconvincing. For instance, Specialty relies on cases interpreting "arising under" clauses. But that language is not at issue here, so the comparison is spurious. *See Explo*, 788 F.2d at 1099. Likewise, Specialty argues that the two arbitration clauses would be redundant if both are read broadly. To the contrary, they coexist harmoniously. Paragraph B.5.c says that "*any* disputes arising out of or related to *this Agreement* will be arbitrated." That language references the entire agreement, not only the specific disputes that might arise from the neutral pipe expert's judgment. And, Polyflow points out, "placement [of that provision] in Section B.5 was sensible: Lest anyone think that by establishing particular procedures for arbitrating [certain disputes,] the parties were limiting the substance of what they would arbitrate to those issues, the parties 'clari[fied]' that they would arbitrate 'any disputes arising out of or related to this Agreement.'" As Polyflow urged at oral argument, broad plus broad equals broad.

## B.

A claim-by-claim review reinforces the contract's general proposition. "Whether a claim falls within the scope of an arbitration agreement under Texas law depends on the factual allegations of the complaint instead of the legal causes of action asserted." *Ford v. NYLCare Health Plans*, 141 F.3d 243, 250 (5th Cir. 1998). "A tort claim . . . is arbitrable if it is so interwoven with the contract that it could not stand alone, but is not arbitrable if it is completely independent of the contract and could be maintained without

No. 20-20416

reference to a contract." *Id.* (quotation omitted). We take each of Polyflow's statutory and common law claims in turn.

*Fraudulent inducement.* "Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Siddiqui v. Fancy Bites*, 504 S.W.3d 349, 369 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The Texas Supreme Court has found claims of fraudulent inducement to be arbitrable under a narrower "involving" arbitration clause, *In re J.D. Edwards World Sols.*, 87 S.W.3d 546, 551 (Tex. 2002), and a broader "arising from or relating to" clause, *In re Kaplan Higher Educ.*, 235 S.W.3d 206, 208–09 (Tex. 2007) (per curiam). As such, this claim surely falls within the parties' arbitration agreement; indeed, Polyflow claims that Specialty made "false representations and promises in the Settlement Agreement itself." The fraudulent inducement claim is arbitrable.

*Trade secrets.* "A trade secret misappropriation in Texas requires: (a) the existence of a trade secret; (b) a breach of a confidential relationship or improper discovery of the trade secret; (c) use of the trade secret; and (d) damages." *Taco Cabana Int'l v. Two Pesos*, 932 F.2d 1113, 1123 (5th Cir. 1991). "A trade secret is any formula, pattern, device or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* Polyflow argues that its trade secret claim similarly falls within the scope of the Settlement Agreement because the agreement helps to establish breach of Specialty's duty. Just so. The Settlement Agreement prohibits Specialty from using or disclosing "Polyflow testing data, . . . models, . . . braid construction model and manufacturing parameters, . . . Case studies and manuals, . . . recipe cards, . . . coupling designs," and a half-dozen other categories of information and materials. These prohibitions constituted a

material part of the consideration that Polyflow received for entering the Settlement Agreement. The trade secret allegations are arbitrable.

*Trademark dilution.* As to Polyflow's trademark claim, Specialty contends there is no provision in the agreement "regarding trademarks or their usage." But this is easily dispatched. Although the Settlement Agreement may not have used the term "trademark," it required Specialty to return "all hard-copy Polyflow information and materials to Polyflow . . . including but not limited to case studies, drawings, testing data, models, model output, presentations, marketing materials, and manuals." And the agreement prevented Specialty from using or disclosing those and other materials "during and after the two-year manufacturing ban." Polyflow has alleged that, in contravention of those terms, Specialty "pass[ed] Polyflow information and products off as [its] own." The trademark claim is arbitrable.

*Unfair competition.* Next, Specialty argues that the unfair competition claims are independent of the Settlement Agreement because they fail the court's standard that arbitrability "depends on the factual allegations of the complaint instead of the legal causes of action asserted." *Ford*, 141 F.3d at 250. But Polyflow points to the Settlement Agreement's prohibition against Specialty "publicly claim[ing] to have any current operational, contractual, or other business relationship with Polyflow." Polyflow alleges that Specialty violated that term by "misrepresenting the Settlement Agreement's terms in the marketplace, and misrepresenting [its] relationship with Polyflow." To that, Specialty offers no rebuttal. Indeed, Specialty cannot point us to a single case outside a lone citation to *Ford*, 141 F.3d at 251. As the party opposing arbitration, Specialty's unsupported argument is fatal to its burden. *See Overstreet*, 462 F.3d at 412. As a result, the federal and state unfair competition claims are arbitrable.

*Tortious interference.*   Finally, the elements of this claim are "the existence of a contract subject to interference, an act of interference that was wilful and intentional, proximately causing plaintiff's damages, with actual damage or loss to plaintiff." *Fridl v. Cook*, 908 S.W.2d 507, 513 (Tex. App.— El Paso 1995, writ dism'd w.o.j.).  In *Fridl*, the court held claims not arbitrable because the plaintiff "could [have brought] the same tortious interference claims against a wholly unrelated party." *Id.*  And, in *Ford*, this court cited *Fridl* approvingly in finding that a "tort action did not depend, as a legal matter, on the contract, and, therefore, was not 'related to' the contract within the meaning of the arbitration clause." *Ford*, 141 F.3d at 251.

In its arbitration demand and FAC, Polyflow alleged that Specialty interfered with its relationships with business partners including Petronas and Exxon.  Polyflow alleged several specific instances that predated the parties' Settlement Agreement, including that "within days after Wright left Polyflow," he told "market participants, such as Petronas, Oxy, and Exxon that Polyflow was lacking talent for the installation of pipe, but that [Specialty] had such talents."  Similarly, before the Settlement Agreement, Polyflow accused Specialty of misleading industry members that Specialty has "some type of agreed relationship with Polyflow."  As for more recent conduct, the FAC says that Specialty has "continued this conduct since the Settlement Agreement with Polyflow's actual and potential customers."  The FAC cites an example in August 2019, when Specialty allegedly sent a letter "to Polyflow's largest customer . . . ma[king] a number of misrepresentations in attempting to improperly interfere with Polyflow's business relationship."

*Fridl* demands that those allegations establish a claim "so interwoven with the contract that it could not stand alone." 908 S.W.2d at 511.  Polyflow says they are, because they "arise from breaches of the Settlement Agreement's provisions prohibiting . . . misrepresentations about the

relationship between Polyflow and [Specialty], and misrepresentations about the Settlement Agreement." Although the relative lack of specifically pleaded facts makes this a close question, we conclude that this claim, too, is arbitrable. Polyflow could bring a *similar* claim against "a wholly unrelated party," *id.* at 513, but it could not bring *the same* claim without reference to Specialty's obligations under the Settlement Agreement. On this score, we are reminded too that Polyflow's arbitration demand was spurred, in part, by the expert's alleged "interfer[ence] in Polyflow's existing contractual relationship with [a] customer." Considering these facts within the standard that "courts must indulge every reasonable presumption in favor of arbitration," *id.* at 511, we find that this claim, like the others, is arbitrable.

In short, our claim-by-claim review reinforces the contract language. Polyflow's entire arbitration demand is arbitrable. We now consider whether any of Specialty's alleged defenses nonetheless bar arbitration.

## C.

Specialty has a myriad of responses to the assertion of arbitrability. It argues that Polyflow seeks to arbitrate matters that the parties agreed to dismiss by the Settlement Agreement; that mediation is a condition precedent to arbitration; that Polyflow materially breached the agreement by dismissing or attempting to dismiss the neutral pipe expert; and that Polyflow waived arbitration by invoking the judicial process.

Before considering these, we must decide whether the court or an arbitrator should address them. We have said that "where the existence of the contract is not in question, the court must examine whether the allegations made by the party resisting arbitration challenge the making of the agreement to arbitrate itself as opposed to allegations regarding the contract as a whole." *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 430 (5th Cir. 2004) (internal quotation and citation omitted). A defense that "does not

specifically relate to the arbitration agreement . . . must be submitted to the arbitrator as part of the underlying dispute." *Id.*

Accordingly, we find that the bulk of Specialty's arguments are for an arbitrator, not the court. Specialty's defenses predicated on pre-Arbitration Agreement conduct, material breach, and mediation do not "attack the 'making' of the agreement to arbitrate itself." *Banc One*, 367 F.3d at 429 (quoting *Prima Paint*, 388 U.S. at 404). Instead, its defenses go right to the heart of the parties' obligations under the Settlement Agreement. These questions implicate the enforceability of the agreement, not its "very existence." *Will-Drill*, 352 F.3d at 215. Specialty concedes an arbitrator's authority to resolve *certain* disputes under the Settlement Agreement. Its attack on the scope of that authority means an arbitrator, not the court, should address these defenses. *See Gen. Warehousemen & Helpers Union Loc. 767 v. Albertson's Distrib.*, 331 F.3d 485, 488 (5th Cir. 2003) ("[W]e do not decide for ourselves these questions of procedural arbitrability; rather, we concentrate on what a rational mind *could* decide.").

In contrast, whether Polyflow waived arbitration by availing itself of the judicial process is a question of law. *Sedillo v. Campbell*, 5 S.W.3d 824, 826 (Tex. App.—Houston [14th Dist.] 1999, no writ). The standard for determining waiver in this context is the same under Texas law or the FAA. *Id.* "Courts will not find that a party has waived its right to enforce an arbitration clause merely by taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment." *Id.* at 827. "Actions that raise the specter of waiver may include the applicant's engaging in some combination of filing an answer, setting up a counterclaim, pursuing extensive discovery, moving for a continuance and failing to timely request arbitration." *Id.* Specialty bears the burden of proving waiver, and its burden is "heavy." *Id.* "Moreover, where, as here, the party seeking arbitration has made a timely demand for arbitration at or before the

commencement of judicial proceedings in the trial court, the burden of proving waiver falls even more heavily on the shoulders of the party seeking to prove waiver." *Sw. Indus. Imp. & Exp. v. Wilmod*, 524 F.2d 468, 470 (5th Cir. 1975) (cleaned up).

Polyflow did not waive its right to arbitration. Indeed, Specialty's argument borders on frivolous. Specialty argues that forcing Specialty to file a motion to dismiss and an answer evinces "clear" prejudice. And it adds that Polyflow "affirmatively brought claims that it seeks by later-filed motion to compel into arbitration." But Polyflow said consistently at the district court that its primary bid for relief was an order compelling arbitration. Polyflow amended its complaint to include substantive claims only as an alternative "to the extent that the Court finds any of the affirmative causes of action should not be sent to arbitration."

Nor did Polyflow change course when it moved to compel arbitration; that course was set when it filed the original complaint. Instead, it was Specialty, not Polyflow, that resisted arbitration. Polyflow has not engaged in any action that is "inconsistent with its right to arbitrate." *Sedillo*, 5 S.W. 3d at 829. This court has declined to find waiver even when a party engages in litigation for far longer before moving to compel arbitration. *See Tenneco Resins v. Davy Int'l*, 770 F.2d 416, 420–21 (5th Cir. 1985) (collecting cases). Specialty has not even approached—much less met—its heavy burden. *See Wilmod*, 524 F.2d at 470.

\*      \*      \*

In assessing this appeal, we have done nothing more than hold the parties to their contractual obligation. Polyflow and Specialty contracted to arbitrate disputes arising out of their Settlement Agreement. Polyflow alleged claims that meet that test. And Specialty offers no justiciable defenses to overcome the presumption in favor of arbitrability. We therefore

No. 20-20416

REVERSE the district court and REMAND with instructions that the parties be ordered into arbitration.