United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 1, 2006**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 2, 2006

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 05-20380

---

PAMELA M TITTLE, etc; ET AL

        Plaintiffs

TITTLE PLAINTIFFS

        Plaintiff-Appellee

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD; FEDERAL
INSURANCE CO

        Interpleader Plaintiffs-Appellees

    v.

ENRON CORPORATION; ET AL

        Defendants

MARY K JOYCE; ROBERT A BELFER; NORMAN P BLAKE, JR; RONNIE C
CHAN; JOHN H DUNCAN; WENDY L GRAMM; ROBERT K JAEDICKE;
CHARLES A LEMAISTRE; MIKIE RATH; SHEILA KNUDSEN; JAMES G
BARNHART; KEITH CRANE; WILLIAM GULYASSY; RODERICK HAYSLETT;
PAUL RIEKER; CINDY OLSON; TOD A LINDHOLM; DAVID SHIELDS

        Defendants-Appellees

    v.

LINDA LAY, as executrix of the Estate of Kenneth L Lay,
substituted in place and stead of Kenneth L Lay, deceased;
JEFFREY K SKILLING

        Defendants-Appellants

---

SEVERED ENRON EMPLOYEES COALITION (SEEC); ET AL

        Plaintiffs

v.

THE NORTHERN TRUST COMPANY; ET AL

Defendants

LINDA LAY, as executrix of the Estate of Kenneth L Lay,
substituted in place and stead of Kenneth L Lay, deceased;
JEFFREY K SKILLING

Defendants-Appellants

v.

PHILLIP J BAZELIDES; JOE H FOY; JAMES S PRENTICE

Defendants-Appellees

---

Appeal from the United States District Court
for the Southern District of Texas, Houston
No. 4:04-CV-3913

---

Before KING, STEWART, and DENNIS, Circuit Judges.

KING, Circuit Judge:

In this interpleader insurance action, defendant-appellants
Kenneth Lay and Jeffrey Skilling appeal the district court's
denial of their motion to compel arbitration and to stay the
interpleader action pending arbitration pursuant to 9 U.S.C.
§§ 3, 4.  For the reasons stated below, we AFFIRM.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Fiduciary Liability Policies

This dispute centers around the interpretation of two
fiduciary liability insurance policies issued by Associated
Electric & Gas Insurance Services, Ltd. ("AEGIS"), and Federal

Insurance Co. ("Federal") (collectively, "the Insurers") to Enron Corporation ("Enron").  For the sake of clarity, a brief overview of the policies and the specific provisions at issue is necessary before reviewing the procedural history of the lawsuit and settlement that underlie this appeal.

**1.    The Primary Policy**

AEGIS issued to Enron its primary liability insurance policy, a Fiduciary and Employee Benefit Liability Insurance Policy with an aggregate limit of $35 million, for the period of May 15, 1999, to May 15, 2002 (the "Primary Policy").  In addition to the $35 million limit, the Primary Policy also includes a Defense Costs Coverage Endorsement to be paid out before the $35 million liability limit to cover the defense costs of the insureds up to $10 million.  The Primary Policy defines the following as "INSURED": Enron, the Employee Benefit Programs, and "any past, present or future trustee, officer, director or employee" of Enron or the Employee Benefit Program or any fiduciaries or administrators of the benefit program.  See 3 R. at 474.  All parties acknowledge that, as a former director of Enron and Enron's former Chief Executive Officer, defendant-appellant Kenneth Lay ("Lay")[1] qualifies as an insured under the

_____

[1]  Kenneth Lay died on July 5, 2006, and his widow, Linda Lay, has been appointed as his personal representative.  In re Estate of Kenneth L. Lay, Deceased, Case No. 365,446, Probate Court No. 1, Harris County, Texas (filed July 20, 2006).  On August 23, 2006, this court granted the Tittle Plaintiffs' motion pursuant to FED. R. APP. P. 43(a) to substitute Linda Lay, in her

policy; likewise, they acknowledge that defendant-appellant Jeffrey Skilling ("Skilling") qualifies as an insured, having been a former director of Enron and Enron's former Chief Financial Officer and Chief Executive Officer.

### 2.    The Excess Policy

For the same period, Federal issued to Enron an Excess Fiduciary Policy (the "Excess Policy") with an aggregate limit of $50 million in excess of the Primary Policy's $35 million limit. The Excess Policy includes an endorsement that generally incorporates the terms and conditions set forth in the Primary Policy, including the dispute resolution provisions. <u>See</u> 3 R. at 512.

### 3.    The Arbitration Clause

Section IV(T) of the Primary Policy, titled "Dispute Resolution and Service of Suit," provides both non-binding and binding procedures for settling policy disputes. <u>See</u> 3 R. at 485-86. Sections IV(T)(1) and IV(T)(2), titled "Negotiation" and "Mediation" respectively, provide for non-binding dispute resolution procedures that must occur before binding arbitration. <u>See</u> <u>id.</u> Once the negotiation and mediation processes are exhausted and binding arbitration is invoked, the parties

<hr />

capacity as the executrix of Kenneth Lay's estate, as a defendant-appellant in Kenneth Lay's stead.  For the sake of consistency, we will continue to refer to both Kenneth Lay and the Estate of Kenneth Lay as "Lay" throughout this opinion.

involved in the dispute must follow the specific binding arbitration procedures set forth in section IV(T)(3) (the "Arbitration Clause"). See 3 R. at 486. The preamble to the Arbitration Clause states:

> Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, which has not been resolved by non-binding means as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent and impartial arbitrators.

Id.

Directly following this language, the remainder of the clause sets out specific procedures that "the SPONSOR ORGANIZATION" and "the COMPANY" must follow in the event that binding arbitration becomes necessary. Under section II(E) and (P) of the Primary Policy, "the SPONSOR ORGANIZATION" is defined as Enron, and "the COMPANY" is defined as AEGIS.[2] See 3 R. at 478-79. The Arbitration Clause specifies that, once binding arbitration has been invoked pursuant to the procedures set forth in section IV(T),

> [t]he SPONSOR ORGANIZATION and the COMPANY each shall appoint one arbitrator; the third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed in accordance with the CPR Rules. If either the SPONSOR ORGANIZATION or the COMPANY has requested the other to participate in a non-binding procedure and the

---

[2] Via the Excess Policy's incorporation provision, however, the procedures set forth in the Primary Policy with regard to AEGIS apply equally to both Insurers. See 3 R. at 512.

other has failed to participate, the requesting party may initiate arbitration before expiration of the above period. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1 et seq. [sic], and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The terms of this POLICY are to be construed in an evenhanded fashion as between the SPONSOR ORGANIZATION and the COMPANY in accordance with the laws of the jurisdiction in which the situation forming the basis for the controversy arose. Where the language of this POLICY is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the SPONSOR ORGANIZATION or the COMPANY. . . . In the event of a judgment being entered against the COMPANY on an arbitration award, the COMPANY at the request of the SPONSOR ORGANIZATION, shall submit to the jurisdiction of any court of competent jurisdiction within the United States of America, and shall comply with all requirements necessary to give such court jurisdiction and all matters relating to such judgment and its enforcement shall be determined in accordance with the law and practice of such court.

3 R. at 486.

## B.    Procedural History

The lawsuit underlying this appeal is a class action breach of fiduciary duty suit, Tittle v. Enron Corp., No. H-01-CV-3913 (S.D. Tex.), brought in 2001 against Enron and its board of directors by various former employees of Enron (the "Tittle Plaintiffs"), alleging breach of fiduciary duties associated with Enron's collapse in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq. The Secretary of Labor subsequently filed a similar action, Chao v. Enron Corp., No. 03-2257, which was consolidated into the Tittle class

-6-

action.  Many of the defendants to this class action, including Lay and Skilling, submitted claims for coverage of their defense costs under the Primary Policy.  The Insurers began paying these claims to the defendants to the class action, including Lay and Skilling, out of the $10 million Defense Costs Coverage Endorsement as provided by the Primary Policy.

On April 15, 2004, a subset of defendants to the <u>Tittle</u> class action (the "Settling Defendants") reached a proposed settlement agreement with the <u>Tittle</u> Plaintiffs and the Department of Labor (the "Partial Settlement"), requiring that the Insurers pay the entire combined $85 million policy liability limits to the <u>Tittle</u> Plaintiffs.  <u>See</u> 3 R. at 404-55.  The Settling Defendants did not include Lay, Skilling, or Enron.  The Partial Settlement did not affect the $10 million Defense Costs Coverage Endorsement, which at the time was still available to the non-settling defendants, including Lay and Skilling.

On May 12, 2004, in response to the growing prospect of litigation over competing claims to the policy proceeds that was likely to arise as a result of the Partial Settlement, and because the Partial Settlement would exhaust the combined policy limits if consummated, the Insurers moved to intervene in the <u>Tittle</u> action and filed a Complaint in the Nature of Interpleader ("Interpleader Complaint") pursuant to FED. R. CIV. P. 22 to determine the proper distribution of the $85 million in policy

proceeds.[3]  See 3 R. at 456-73.  The Interpleader Complaint named as interpleader defendants many of the parties who had submitted or could potentially submit claims against the policies, including the Settling Defendants, Enron,[4] and Lay and Skilling. See 3 R. at 462-66.  Over opposition from Lay and Skilling, the district court granted the Insurers' motion to intervene and subsequently granted the Insurers permission to tender the entire $85 million in policy proceeds to the district court.  See 9 R. at 1488.  The Insurers deposited the funds with the court, reserving in the Interpleader Complaint their right to recover proceeds to the extent that the funds "are not ultimately required to resolve covered claims."[5]  3 R. at 469.

---

[3]  The $10 million Defense Costs Coverage Endorsement, out of which the Insurers had been paying the defense costs of various insureds prior to filing the Interpleader Complaint, is not part of the interpleader action.  See 8 R. at 1331.  At oral argument, the parties noted that this fund had not yet been exhausted at the time that the Interpleader Complaint was filed, but has since been exhausted.

[4]  Although Enron is an insured and was not included in the Partial Settlement, it did not object to the Partial Settlement and made no claims to the interpleaded policy proceeds in its answer to the Insurers' subsequent Interpleader Complaint.  See 2 R. 387, 9 R. 1437-43.

[5]  Specifically, the Interpleader Complaint states:

As a result of the multiple and conflicting claims, plaintiffs [i.e., the Insurers] are unable to determine as between conflicting claims which defendants are entitled [to] what portions of the policy limits available because the demands exhaust the limits of liability of the policies without providing releases to all Insureds.  Plaintiffs concede that, at present, the $85 million in combined coverage must be paid to resolve

-8-

On September 20, 2004, various of the interpleader defendants filed answers to the Interpleader Complaint, asserting their claims to the policy proceeds.  See generally 8-9 R. Specifically, Lay and Skilling each filed an answer asserting his right to the payment of all attorneys' fees and legal costs incurred in their defense of claims asserted against them in the Tittle litigation.  See 8 R. at 1348-52, 1395-97.  Additionally, they demanded that an equitable share of the policies' proceeds be held in reserve to provide them coverage against a possible judgment or settlement in that litigation.  Id.  On the same day, along with his answer, Skilling filed a Motion to Compel Arbitration and Stay the Interpleader Action ("Arbitration Motion") pursuant to sections 3 and 4 of the Federal Arbitration

---

claims against Insureds.  However, there are a number of future contingencies that could affect the amounts ultimately required to resolve covered claims against Insureds and the timing of any such payments.  These contingencies include, inter alia:

- Court approval of any settlement of the class action claims against Insureds;
- Satisfaction or waiver of each of the conditions precedent to the closing of any settlement agreement; and
- Any necessary Bankruptcy Court approval.

While plaintiffs stand neutral as to the appropriate use of the policy limits to resolve covered claims against the Insureds, and seek discharge from all obligations under or relating to the policies, they reserve the right to seek the return of any funds that are not ultimately required to resolve covered claims.

3 R. at 469.

Act ("FAA"), 9 U.S.C. §§ 3, 4, asserting that resolution of the interpleader defendants' competing claims to the policy proceeds is governed by the Primary Policy's Arbitration Clause, which requires that any controversy or dispute "arising out of or relating to" the policies be resolved by binding arbitration. See 8 R. at 1356. Also on September 20, 2004, Lay filed a motion to join Skilling's Arbitration Motion. See 8 R. at 1372. Lay and Skilling were the only interpleader defendants to request arbitration.

**C.     The District Court Memorandum and Order**

The district court granted Lay's motion to join Skilling's Arbitration Motion but denied the Arbitration Motion itself in a memorandum and order dated March 15, 2005. In re Enron Corp. Secs., Derivative & "ERISA" Litigation, No. H-01-3913 (S.D. Tex. March 15, 2005) [hereinafter "Dist. Ct. Order"]. Based on its review of the policy language, the district court held that the dispute at issue--which it characterized as a disagreement among the various insureds over the allocation of the $85 million in policy proceeds that the Insurers agreed to pay out--was not an arbitrable dispute because the parties to the policy did not agree to arbitrate a dispute in the nature of the one in question. As an initial matter, the district court found that the Arbitration Clause applies only to "any controversy or dispute arising out of or relating to" the policy, and a

-10-

settlement within the policy limits between the Insurer and the insureds means that there is no controversy or dispute.  Dist. Ct. Order at 17.  Further, the district court found that there can be no arbitrable controversy or dispute within the scope of the Arbitration Clause in this case because a reading of both policies in their entirety reveals that the Arbitration Clause was meant to apply only to disputes over coverage between the insureds and the Insurers.  Because the Insurers agreed to pay out the entire $85 million policy limit, tendered the proceeds to the district court, and proclaimed their neutrality as to the allocation of the proceeds, they "no longer [have] an interest in the $85 million"; therefore, there is not a dispute between the insureds and the Insurers, only a dispute among the various insureds.  Dist. Ct. Order at 17.  Finally, the district court noted that Texas law governing insurance settlements supports its conclusion that no arbitrable dispute exists:

> Under Texas law, an insurer's Stowers duty to settle a claim against its insured is triggered by a settlement demand if the claim against the insured is within the policy's scope of coverage, if the demand is within the limits of the policy, and if the terms of the demand are such that an ordinarily prudent insurer would accept it considering the likelihood and extent of the insured's potential exposure to an excess judgment. State Farm Lloyds Ins. Co. v. Maldonado, 963 S.W.2d 38, 41 (Tex. 1998).  Moreover, an insurer does not have to provide funds for all its insureds before exhausting policy limits.  See, e.g., Travelers Indemnity Co. v. Citgo Petroleum Corp., 166 F.3d 761 (5th Cir. 1999) . . . .

Id. at 18.

On April 12, 2005, Lay and Skilling filed their timely

-11-

notice of appeal from the denial of their Arbitration Motion with this court.

## II. DISCUSSION

### A. Jurisdiction

The district court had subject-matter jurisdiction over the underlying ERISA action in this case under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331. It accordingly asserted supplemental jurisdiction over the Insurers' related FED. R. CIV. P. 22 interpleader action pursuant to 28 U.S.C. § 1367(a).

Because the district court denied Lay and Skilling's Arbitration Motion, which asked the court to stay the proceeding and compel arbitration under 9 U.S.C. §§ 3, 4, this court has jurisdiction over this appeal pursuant to 9 U.S.C. § 16(a)(1)(A), (B), which provides that "[a]n appeal may be taken from an order refusing a stay of any action under section 3 of this title," or an order "denying a petition under section 4 of this title to order arbitration to proceed . . . ."

### B. Standard of Review

This court reviews de novo a district court's denial of a motion to compel arbitration under 9 U.S.C. § 4. See Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 471 (5th Cir. 2002); Webb v. Investacorp., Inc., 89 F.3d 252, 257 (5th Cir. 1996). We also review de novo a denial of a motion to stay a proceeding pending arbitration. See Harvey v. Joyce, 199 F.3d 790, 793 (5th Cir.

2000).[6]

The Supreme Court has enunciated four general principles applicable to determining arbitrability that guide our consideration of the Arbitration Clause at issue in this case. First, "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.'" AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (quoting Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)). Second, given that arbitrators derive their authority from an agreement between the parties to arbitrate, "'the question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'" AT&T Techs., 475 U.S. at 649 (quoting Warrior & Gulf, 363 U.S. at 582-83). Third, "in deciding whether the parties have agreed to submit a particular

---

[6] We reject the Settling Defendants' argument that, if this court holds that Lay and Skilling have an arbitrable claim, the appropriate action is to remand to the district court to determine whether a discretionary stay is appropriate. Under 9 U.S.C. § 3, a stay is mandatory at the request of a party if the dispute is arbitrable under 9 U.S.C. § 4 and it is referred to arbitration; therefore, the appropriateness of the district court's denial of the stay essentially depends upon our de novo review of the order denying Lay and Skilling's motion to compel arbitration. See Harvey, 199 F.3d at 793 (noting that "[w]e review a district court order refusing to stay an action pending arbitration under the de novo standard of review" and proceeding to examine whether the dispute at issue was arbitrable under 9 U.S.C. § 4).

-13-

grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." AT&T Techs., 475 U.S. at 649; see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 (1967); Primerica, 304 F.3d at 471-72. And finally, "where the contract contains an arbitration clause, there is a presumption of arbitrability." AT&T Techs., 475 U.S. at 650; see also Primerica, 304 F.3d at 471 (citing Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)). Such a presumption means that, "[i]n determining whether the dispute falls within the scope of the arbitration agreement, 'ambiguities . . . [are] resolved in favor of arbitration.'" Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002) (quoting Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475 (1989)).

## C.   Analysis

When considering a motion to compel arbitration under the FAA,[7] a court employs a two-step analysis. First, a court must "determine whether the parties agreed to arbitrate the dispute in

---

[7] No party disputes the applicability of the FAA to the Arbitration Clause at issue in this case, which, as reflected in the Interpleader Complaint, was part of a "contract evidencing a transaction involving commerce"; i.e., an insurance policy providing liability insurance to insureds in a number of different states. See 9 U.S.C. § 2 (specifying that the FAA applies to any arbitration clause in "a contract evidencing a transaction involving commerce"); see also 8 R. at 1327-28 (reflecting that the Primary and Excess Policies provided coverage to insureds residing in at least five states, the District of Columbia, and three foreign nations).

question." <u>Webb</u>, 89 F.3d at 258; <u>see also</u> <u>Mitsubishi Motors Corp. v. Soler Chysler-Plymouth</u>, 473 U.S. 614, 626 (1985). Second, a court must determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." <u>Mitsubishi Motors</u>, 473 U.S. at 628. Because no party has argued that external legal constraints have foreclosed the arbitration of the claims at issue in this case, we need only conduct the first step of the analysis to resolve the arbitrability question.

The first step of the analysis--whether the parties agreed to arbitrate the dispute in question--consists of two separate determinations: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." <u>Webb</u>, 89 F.3d at 258 (citing <u>Daisy Mfg. Co. v. NCR Corp.</u>, 29 F.3d 389, 392 (8th Cir. 1994)); <u>see also</u> <u>Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.</u>, 139 F.3d 1061, 1065 (5th Cir. 1998). Because no party challenges the validity of the policies (or of the Arbitration Clause), the only issue in this case is whether the dispute falls within the scope of the Arbitration Clause. This question, in turn, will require this court to consider the two major areas of contention in this appeal--the scope of the Arbitration Clause itself and the nature of the dispute at issue.

**1. Scope of the Arbitration Clause**

Lay and Skilling argue that the language of the Arbitration Clause should be construed broadly to include disputes between the Insurers and insureds as well as disputes among the insureds themselves. They assert that the Arbitration Clause applies to "[a]ny controversy or dispute arising out of or relating to this POLICY," without explicitly limiting its application to disputes between certain parties.

In contrast, the Settling Defendants and the Insurers argue that the Arbitration Clause applies only to disputes between the Insurer and the parties defined as insureds under the policies. They note that Lay and Skilling quote only the preamble to the Arbitration Clause in their brief, focusing on the "arising out of or relating to" language to the exclusion of the remainder of the Arbitration Clause and the rest of the language in section IV(T) of the Primary Policy. The Settling Defendants argue that reading the "arising out of or relating to" language in the context of these provisions, which refer only to "the SPONSOR ORGANIZATION" (i.e., Enron) and "the COMPANY" (i.e., the Insurers), necessarily means that the Arbitration Clause applies only to disputes between Enron (or the other insureds for whom Enron serves as the "sponsor organization") and the Insurers, not to disputes among the insureds themselves under circumstances where there is no dispute with an Insurer.

To determine the scope of the Arbitration Clause at issue in this case, this court must apply Texas rules of contract

interpretation.  See Washington Mut. Fin. Group v. Bailey, 364 F.3d 260, 264 (5th Cir. 2004) ("[I]n determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law of the particular state that governs the agreement."); Harvey, 199 F.3d at 793 (applying state-law contract principles); Webb, 89 F.3d at 258 ("'[C]ourts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'") (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).  Under Texas law,[8] a court construing a contract must read that contract in a manner that confers meaning to all of its terms, rendering the contract's terms consistent with one another.  See FDIC v. Conn. Nat'l Bank, 916 F.2d 997, 1001 (5th Cir. 1990); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983); see also SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005); Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).  In doing so, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. . . . No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."  Coker, 650 S.W.2d at 393.

---

[8]  All parties acknowledge that Texas state law governs the insurance policies at issue here.

Applying these principles to the insurance policies at hand, we agree with the Settling Defendants and the district court that the scope of the Arbitration Clause is limited only to disputes, arising out of or related to the policies, that include an Insurer and one or more insureds.  The Arbitration Clause itself, located in section IV(T)(3) of the Primary Policy, must be read in context with the other provisions of the contract, in particular the entirety of section IV(T), which governs "Dispute Resolution and Service of Suit."  The subsections directly preceding the Arbitration Clause set out a number of non-binding dispute resolution procedures that must be invoked by either Enron or the Insurers before binding arbitration can occur.  The language of these provisions, which references <u>only</u> Enron and the Insurers, indicates that these procedures apply only to situations where there is a dispute with an Insurer.  For instance, section IV(T)(1), a provision addressing "Negotiation," provides that

> <u>[t]he SPONSOR ORGANIZATION and the COMPANY</u> shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between executives who have authority to settle the controversy. . . . Within thirty (30) days after delivery of the disputing party's notice, the executives of <u>both parties</u> shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.

4 R. at 485-86 (emphasis added).

Moreover, while the preamble to the Arbitration Clause

-18-

itself uses the phrase "arising out of or related to," language which the Supreme Court has acknowledged can sweep broadly in scope, see Prima Paint, 388 U.S. at 406, the breadth of that scope is limited by the language in the remainder of the provision.  Indeed, the very procedures that the Arbitration Clause requires Enron and the Insurers to follow once binding arbitration has been invoked would be logical only in the case of a dispute where an Insurer is adverse to one or more of the insureds.  For example, directly following the "arising out of or related to" language, the Arbitration Clause instructs that, upon the initiation of binding arbitration,

> [t]he SPONSOR ORGANIZATION and the COMPANY each shall appoint one arbitrator; the third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed in accordance with the CPR Rules.  If either the SPONSOR ORGANIZATION or the COMPANY has requested the other to participate in a non-binding procedure and the other has failed to participate, the requesting party may initiate arbitration before expiration of the above period.
>
> . . .
>
> The terms of this POLICY are to be construed in an evenhanded fashion as between the SPONSOR ORGANIZATION and the COMPANY in accordance with the laws of the jurisdiction in which the situation forming the basis for the controversy arose.
>
> . . .
>
> In the event of a judgment being entered against the COMPANY on an arbitration award, the COMPANY at the request of the SPONSOR ORGANIZATION, shall submit to the jurisdiction of any court of competent jurisdiction within the United States of America . . . .

3 R. at 486.

Interpreting the Arbitration Clause to encompass disputes that do not include an Insurer would render many of these agreed-to procedures set forth in section VI(T) inconsistent and largely meaningless, particularly as those procedures apply to the Insurers. If the Arbitration Clause encompassed such disputes, neither Insurer would have an interest in participating in the required non-binding dispute resolution procedures prior to arbitration or in selecting an arbitrator in cases where an Insurer is not involved in the dispute. Nonetheless, these procedures must be invoked in every case prior to commencing binding arbitration, and the Arbitration Clause does not provide alternative procedures to follow should disputes involving only insureds arise. This omission indicates that the parties to the policies intended the dispute resolution procedures to apply only to the disputes for which procedures are provided--i.e., only to situations where there is a dispute with an Insurer. See Coker, 650 S.W.2d at 393 ("In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."). Furthermore, the Arbitration Clause itself would be internally inconsistent if it were read to encompass disputes that do not include an Insurer because it provides neither an agreement by the insureds to arbitrate disputes only among themselves, nor a mechanism by which each side of a dispute consisting of only insureds may appoint arbitrators. Had the parties contemplated arbitration of

-20-

disputes among competing insureds in circumstances where there is no dispute with an Insurer, they could have provided a mechanism to represent the adverse interests of the insureds when appointing arbitrators. They did not.

Therefore, given the plain language of section IV(T), our reading of the Arbitration Clause--i.e., that it applies only to disputes, arising out of or related to the policy, that include an Insurer and one or more insureds--is the most natural and, in the context of the entire policy, best harmonizes and gives effect to all of the provisions contained therein. See MCI Telecomms. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999) ("When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless.") (citing City of Midland v. Waller, 430 S.W.2d 473, 478 (Tex. 1968); Universal C.I.T. Credit Corp. v. Daniel, 243 S.W.2d 154, 158 (1951)); Coker, 650 S.W.2d at 393.

## 2. Nature of the Instant Dispute

"[A] party cannot be required to submit to arbitration any dispute which he has not agreed to submit." Warrior & Gulf, 363 U.S. at 582. Therefore, having determined that the scope of the Arbitration Clause extends only to disputes arising out of or related to the policies that include an Insurer and one or more insureds, we now must decide whether the dispute in the instant

-21-

case falls within this scope.  That is, we must determine whether the interpleader action (1) arises out of or relates to the Primary and Excess Policies, and (2) constitutes a dispute that includes an Insurer and one or more insureds.

Lay and Skilling argue that the disputes over the distribution of policy proceeds "'arise out of' and 'relate to' the Primary and Excess Policies in the strictest sense--were it not for those policies, there would be neither funds to interplead nor any legal basis for the insureds' competing claims."  Defendants-Appellants' Br. at 29.  They further assert that the nature of the dispute as an interpleader action does not mean that the dispute falls outside of the scope of the Arbitration Clause.  Lay and Skilling contend that, rather than avoiding disputes with the insureds when they filed their interpleader complaint, the Insurers in effect created a dispute with every insured by not agreeing to any of their demands.  Finally, Lay and Skilling argue that the Insurers admitted the existence of a dispute when they filed their interpleader complaint because Article III of the United States Constitution prevents courts from adjudicating matters that are not actual "cases or controversies"; if there were no dispute, the district court should have dismissed the interpleader action.

On the other hand, the Settling Defendants and the Insurers argue that the dispute is outside the scope of the Arbitration Clause because it does not arise out of or relate to the

-22-

policies.  Moreover, they assert that, even if the dispute did arise out of or relate to the policies, Lay and Skilling do not have a dispute with the Insurers; rather, their dispute is with the Settling Defendants over the proper allocation of the $85 million in policy proceeds.  Because the Insurers have agreed to pay out the entire $85 million policy limit, tendered the funds to the district court, and "stand neutral" as to the proper distribution of the funds, the Settling Defendants and the Insurers maintain that there is nothing for the Insurers to arbitrate with the insureds and therefore no dispute within the meaning of the Arbitration Clause.

### a.    "Arising Out of or Related To"

A dispute "arises out of or relates to" a contract if the legal claim underlying the dispute could not be maintained without reference to the contract.  <u>Ford v. NYLCare Health Plans of the Gulf Coast, Inc.</u>, 141 F.3d 243, 250 (5th Cir. 1998) (noting that a claim does not "arise out of or relate to" a contract if the claim "is completely independent of the contract and could be maintained without reference to a contract").  Under this definition, the instant dispute arises out of and is related to the Primary and Excess Policies because those policies are not only the source of the interpleaded fund, but they are also the source of any insured's legal right to the proceeds of that fund. In other words, Lay and Skilling could not assert a claim to any

-23-

of the policy proceeds without reference to their contractual right to those proceeds under the policies.[9]  However, as we explained above, the Arbitration Clause contains further language limiting its scope to such disputes that include an Insurer and one or more insureds, notwithstanding the broad construction that some courts have given to "arising out of or related to" language in arbitration clauses in cases where the applicability of the clauses to specific parties was not an issue.  See Prima Paint, 388 U.S. at 406 (interpreting the "arising out of or related to" phrase broadly to encompass a fraud in the inducement claim without having to address whether the arbitration clause applied to the specific parties before the Court); cf. Mayflower Ins. Co. v. Pellegrino, 261 Cal. Rptr. 224, 227-28 (Cal. Ct. App. 1989) (refusing to compel arbitration of a dispute between insureds because the policy's arbitration provision contemplated only the arbitration of disputes between the insurer and the insureds).

---

[9]  The Settling Defendants' reliance on Ford for the proposition that the insureds' claims to the policy proceeds do not arise out of or relate to the policies is misplaced.  The court in Ford addressed a situation where the plaintiff brought a false advertising claim in tort against the defendants, with whom he had a contractual relationship.  The defendants attempted to compel arbitration under the FAA based on the arbitration clause in their contract with the plaintiff, but the court held that the false advertising claim did not "arise out of or relate to" the contract as required by the arbitration clause because the plaintiff could maintain his action in tort without reference to the contract.  In contrast, but for the existence of the insurance policies in the instant case, Lay and Skilling could not maintain their claims for the policy proceeds in tort or under any other legal theory independent of the policies.

Therefore, in this case, because the policy language limits the Arbitration Clause's applicability to disputes that include an Insurer, the mere fact that this dispute "aris[es] out of or relate[s] to" the policies does not end our analysis as Lay and Skilling urge. We still must determine whether this dispute includes an Insurer or is more appropriately characterized as a dispute only among various insureds.

### b. The Interpleader Action

Under the circumstances of this case, we conclude that the only existing dispute is one only among various insureds. By filing their Interpleader Complaint and tendering the entire $85 million in policy proceeds to the district court, the Insurers have effectively removed themselves from any dispute by conceding coverage up to the policy limits and remaining neutral as to the proper distribution of the funds. See 3 R. at 469. All that now remains is a dispute among the insureds (i.e., Lay, Skilling, and the Settling Defendants) over the appropriate allocation of the policy proceeds; therefore, this dispute falls outside the scope of the Arbitration Clause.

This conclusion is consistent with the purpose of interpleader as a procedural device: to shield a stakeholder (in this case, the Insurers) from liability when faced with the threat of multiple inconsistent claims to a single fund by allowing the stakeholder to tender that fund to the court in lieu

of defending against multiple possible lawsuits.  See Rhoades v. Casey, 196 F.3d 592, 600 n.8 (5th Cir. 1999) ("The legislative purpose of an interpleader action is to remedy the problems posed by multiple claimants to a single fund, and to protect a stakeholder from the possibility of multiple claims on a single fund."); Wausau Ins. Cos. v. Gifford, 954 F.2d 1098, 1100 (5th Cir. 1992).  The procedural device of interpleader, then, allows a stakeholder effectively to avoid a dispute with the claimants while the court determines the proper allocation of the disputed fund:

> [t]he principle of interpleader is that, where two persons are engaged in a dispute, and that which is to be the fruit of the dispute is in the hands of a third party, who is willing to give it up according to the result of the dispute, then, . . . that third person . . . is not to be obliged to be at the expense and risk of defending an action; but, on giving up the thing . . ., <u>he is to be relieved, and the Court directs that the persons between whom the dispute really exists shall fight it out at their own expense</u>. The mere statement of the principle shows its justice.

7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1702 (3d. ed. 2001) [hereinafter WRIGHT & MILLER] (quoting Evans v. Wright, C.P. 1865, 13 Weekly Reporter 468, 12 Law Times 77 (per Willes, J.) (Eng.) (emphasis added)).  In other words,

> [i]nterpleader was originally designed to protect the stakeholder. . . . The protection afforded by interpleader takes several forms. Most significantly, it prevents the stakeholder from being obliged to determine at his peril which claimant has the better claim, and, when the stakeholder has no interest in the fund, <u>forces the claimants to contest what essentially is a</u>

> controversy between them without embroiling the
> stakeholder in the litigation over the merits of the
> respective claims.

7 WRIGHT & MILLER § 1702.  Likewise, in Treinies v. Sunshine Mining

Co., 308 U.S. 66, 72 (1939), the Supreme Court relied on this

concept when it held that a stakeholder's citizenship in a

statutory interpleader action based on diversity jurisdiction

need not be diverse from the citizenship of the claimants because

> there is a real controversy between the adverse
> claimants.  They are brought into the court by the
> complainant stakeholder who simultaneously deposits the
> money or property, due and involved in the dispute into
> the registry of the court.  This was done in this case.
> The [interpleader statute] provides that the 'court shall
> hear and determine the cause and shall discharge the
> complainant from further liability.'  Such deposit and
> discharge effectually demonstrates the applicant's
> disinterestedness as between the claimants and as to the
> property in dispute, an essential in interpleaders.

Id. (emphases added); see also Haynes v. Felder, 239 F.3d 868,

871 (5th Cir. 1957) (citing Treinies and holding that only the

claimants to the interpleaded fund need be diverse to the

diversity-of-citizenship requirement in an interpleader

action).[10]  For this reason, Lay and Skilling's contention that

---

[10]  Given this precedent acknowledging that the real dispute
in an interpleader action is between the adverse claimants--and
that even the mere "threat of multiple vexation by future
litigation provides sufficient basis for interpleader," Corrigan
Dispatch, 696 F.2d at 364--we find no merit in Lay and Skilling's
argument that no Article III case or controversy can exist if we
hold that the Insurers do not have a dispute with the insureds.
Lay and Skilling fail to point us to any cases where a court has
dismissed an interpleader action on such a ground, and we have
found none.  There is certainly a dispute in this case sufficient
to constitute an Article III case or controversy; the dispute
simply does not fall within the scope of the Arbitration Clause.

the Insurers <u>created</u> a dispute with each insured when it filed the Interpleader Complaint is without merit. Characterizing an interpleader action in that manner would undermine a stakeholder's primary reason for filing an interpleader complaint in the first place, which is to avoid a dispute with competing claimants to the interpleaded fund. See <u>Corrigan Dispatch Co. v, Casa Guzman, S.A.</u>, 696 F.2d 359, 364 (5th Cir. 1983) ("Interpleader is a device which allows a party in possession of money or property belonging to another to join two or more parties asserting mutually exclusive claims to the property or fund in a single suit, thereby freeing the stakeholder from multiple liability or multiple lawsuits."). Therefore, faced with the threat of multiple vexation resulting from potential lawsuits with various insureds asserting claims to the policy proceeds, the Insurers availed themselves of the procedural protections of interpleader described above. In so doing, they <u>avoided</u> disputes with each of the insureds by tendering the entire $85 million policy limit to the district court and remaining neutral as to its allocation. See <u>Rhoades</u>, 196 F.3d at 600 n.8; 7 WRIGHT & MILLER § 1702.

Nonetheless, Lay and Skilling contend that, because the Insurers filed a complaint <u>in the nature of interpleader</u> rather than a strict bill of interpleader, the Insurers have not avoided

a dispute with the insureds.[11]  But such a distinction makes little difference in our analysis, at least as it applies to the dispute as it currently stands.  Lay and Skilling argue that the Insurers' contingent interest in the fund, as well as the Insurers' continued ability to assert coverage defenses against Lay and Skilling at any time, create an ongoing dispute with the Insurers within the meaning of the Arbitration Clause.  However, these reservations of rights merely create the possibility of a hypothetical future dispute; they do not create a present dispute.  Since a prerequisite to any interpleader action is the existence of multiple, mutually exclusive claims to a single fund, the interpleader would no longer be viable if the policy limits were not exhausted because the competing claims would no

---

[11]  A party who files a strict bill of interpleader relinquishes all interest in the interpleaded funds, while a party who files a bill in the nature of interpleader reserves at least some right to those funds.  See Texas v. Florida, 306 U.S. 398, 406-07 (1939) ("The essential of the bill in the nature of interpleader is that it calls upon the court to exercise its jurisdiction to guard against the risks of loss from the prosecution in independent suits of rival claims where the plaintiff himself claims an interest in the property or fund which is subjected to the risk."); see also FED. R. CIV. P. 22(1) (allowing for both strict interpleader complaints and complaints in the nature of interpleader).  Here, the Insurers filed a complaint in the nature of interpleader, conceding coverage up to the $85 million policy limit, tendering the entire amount to the district court, and asking to be discharged from any further liability once the $85 million in proceeds have been paid in full.  3 R. at 470.  Consistent with a bill in the nature of interpleader, however, the Insurers also have reserved a contingent interest in the fund to the extent that the full amount is "not ultimately required to resolve covered claims" and have not waived any coverage defenses available to them.  3 R. at 469.

longer be mutually exclusive.  See White v. F.D.I.C., 19 F.3d 249, 251 (5th Cir. 1994) ("Interpleader is a procedural device which entitles a person holding money or property, concededly belonging at least in part to another, to join in a single suit two or more persons asserting mutually exclusive claims to the fund.").  If that were to happen, a dispute within the meaning of the Arbitration Clause could potentially arise because any potential future decision by the Insurers to deny coverage for Lay or Skilling would have to be litigated or arbitrated in a later action.  Likewise, if, in the future, the Insurers decide to assert one or more coverage defenses against Lay or Skilling, such an action might create a dispute within the meaning of the Arbitration Clause.  However, because the Insurers have not taken such an action, no arbitrable dispute exists at this time.  We therefore hold that, because the only present dispute is one among the insureds over the proper allocation of the interpleaded funds, and because the scope of the Arbitration Clause does not encompass such a dispute, the district court properly denied Lay and Skilling's Arbitration Motion.[12]

---

[12]  Lay and Skilling also argue that the district court erred by delving into the merits of the interpleader action when it denied their Arbitration Motion.  We agree that this aspect of the district court's order is problematic, specifically its reliance on substantive Texas state law to conclude that, because the settlement terms are reasonable under Texas case law, the Insurers can fully fund the Partial Settlement out of the interpleaded funds to the exclusion of the other insureds.  See Dist. Ct. Order at 17-22 (explaining that Texas law allows an insurer to enter into a reasonable settlement with a subset of

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Lay and Skilling's Arbitration Motion.

---

insureds, even if the settlement would exhaust the policy limits and prevent other insureds from collecting).  It is well established that such a merits-based determination has no place in an arbitrability analysis.  See AT&T Techs., 475 U.S. at 649 ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."); Primerica, 304 F.3d at 471-72 ("When conducting this two-pronged [arbitrability] analysis, courts must not consider the merits of the underlying action.") (citing Snap-On Tools Corp. v. Mason, 18 F.3d 1261, 1267 (5th Cir. 1994)); see also 1 JAY E. GRENIG, ALTERNATIVE DISPUTE RESOLUTION § 6:46 (3d ed. 2005) ("It is not the function of the court to determine whether the claim with respect to which arbitration is sought is valid or otherwise to rule on the merits of the dispute.").

However, we decline Lay and Skilling's invitation to reverse the district court on this ground because, as explained above, we conclude pursuant to our de novo review that the scope of the Arbitration Clause does not encompass the dispute at issue.  To reach this conclusion, we do not--and need not--consider the merits of the underlying interpleader action or opine on which principles will govern the eventual distribution of the interpleaded funds.  Given that the dispute falls outside the scope of the Arbitration Clause, the district court's ultimate determination that arbitration cannot be compelled under the FAA in this instance was correct.  See Warrior & Gulf, 363 U.S. at 582 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.").