# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

No. 20-20032

IMA, Incorporated,

*Plaintiff—Appellee*,

*versus*

Columbia Hospital Medical City at Dallas, Subsidiary L.P., *doing business as* Medical City Dallas Hospital,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-3500

Before Higginbotham, Jones, and Higginson, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Columbia Hospital Medical Center at Dallas, L.P., d/b/a Medical City Dallas Hospital ("Columbia Hospital") seeks to compel IMA, Inc., a health plan administrator, to arbitrate a dispute involving unreimbursed medical fees. The parties are connected by a series of intermediary agreements within a preferred provider organization ("PPO") network that allows patients in covered health plans to receive medical services from participating hospitals at discounted rates. One of those agreements contains an arbitration clause. The district court denied Columbia Hospital's motion

No. 20-20032

to compel arbitration, holding that IMA is not a party to, and is not otherwise bound by, the agreement containing the arbitration provision. On appeal, Columbia Hospital argues that the district court erred in declining to compel arbitration under direct benefits estoppel, or alternatively to construe the series of agreements as a single, unified contract. We AFFIRM.

## I.

IMA is the third-party administrator of the Central Management Company, LLC Employer Health Plan ("Health Plan"), which IMA maintains is covered by ERISA. In February 2016, T.S., a member of the Health Plan, received two spinal surgeries at Columbia Hospital. Prior to the surgeries, Columbia Hospital obtained authorization numbers confirming that T.S. was a member of an in-network health plan. Columbia Hospital subsequently sought reimbursement for the surgeries and spine implants from IMA.

It is undisputed that IMA, a plan administrator, and Columbia Hospital, a services provider, do not have a direct contract with one another. Instead, they are connected through a series of intermediary agreements entered into over approximately ten years that connect hospitals (like Columbia Hospital) with various PPO networks, then to plan administrators (like IMA), and finally to health plans and patients.

### A.     Relevant agreements

Effective April 2012, Columbia Hospital agreed to provide discounted services to HealthSmart Preferred Care II, L.L.C. ("HealthSmart"), a PPO network. The terms of this arrangement were entered in a "Hospital Agreement" between Hospital Corporation of America North Texas Division, Inc. ("HCA"), acting on behalf of Columbia Hospital and other hospitals, and HealthSmart. Pursuant to this agreement, Columbia Hospital would provide services as a "Participating Hospital" to the HealthSmart

network and its "Groups,"[1] based on the discounted reimbursement rates specified in "Exhibit B," which was attached to the agreement. In turn, HealthSmart agreed to "ensure that any Group accessing [Columbia Hospital's] rates . . . is contractually bound to [Columbia Hospital] to adhere to the terms and conditions of this Agreement," and that HealthSmart "shall require" the Group to pay the rates specified in Exhibit B. The Hospital Agreement also contains the following arbitration provision:

> Dispute Resolution. Any dispute arising out of, relating to, involving the interpretation of, or in any other way pertaining to this Agreement shall be resolved using alternative dispute resolution mechanisms instead of litigation. Network, Group, and Participating Hospital agree and acknowledge that it is their mutual intention that this provision be construed broadly so as to provide for mediation and/or arbitration of all disputes arising out of this relationship.

IMA, as a plan administrator, similarly entered into agreements with PPO networks so that its members could access discounted medical services with "hundreds of providers." One of those agreements was a Preferred Provider Organization TPA Agreement with PPOplus, LLC, effective March 2003, so almost a decade earlier (the "IMA-PPOplus Agreement"). This

---

[1] "Group" is defined as "any entity" including "an association, employer, federal or state reimbursement program, . . . preferred provider organization, . . . third party administrator, [or] healthcare service plan . . . that is approved by [Columbia Hospital] and that provides a Plan and that pays or agrees to pay [Columbia Hospital] for the Covered Services it provides to Covered Person(s) pursuant to terms and conditions of this Agreement."

"Plan" is defined as a "health benefits plan for which a Group has entered into a Group Agreement with [HealthSmart] to arrange for the provision of Covered Services to Covered Person(s)."

No. 20-20032

contract allows IMA to access the "Participating Providers"[2] in the PPOplus network at the "PPO Contracted Rates," which are defined as the "rates or fees agreed upon by PPO and Participating Provider." Relevant here, IMA "agrees to pay claims of Participating Providers in accordance with the applicable Plan and the PPO Contracted Rates," and to pay PPOplus a "Network Access Fee." In exchange, PPOplus is required to "directly or indirectly arrange for, enter into, maintain, and enforce Provider Agreements with . . . Participating Providers." This 2003 contract with IMA as a signatory does not include an arbitration clause.

A year earlier in 2002, PPOplus entered into a "Network Cross Access Agreement" with HealthSmart.[3] This agreement provides "reciprocal access" between PPOplus and HealthCare's network of providers. In return, both networks "shall require their respective Clients to pay the claims of the other party's Participating Providers in accordance with the applicable Plan and the other party's Contracted Rates." This agreement similarly does not have an arbitration clause.

In sum, Columbia Hospital contracted with HealthSmart, which separately contracted with PPOplus, which had contracted almost a decade earlier with IMA, which administered T.S.'s health plan. Only the 2012 Hospital Agreement between Columbia Hospital and HealthSmart contains an arbitration provision.

---

[2] "Participating Provider" is defined as a "provider or group of providers (including any hospital, physician, or other health care provider) who has entered into a contractual agreement with PPO to provide Covered Services to Beneficiaries."

[3] While the party to this agreement, HealthSmart Preferred Care, Inc., is different from the party to the Hospital Agreement, HealthSmart Preferred Care II, L.L.C., neither party disputes that the two entities are related or that IMA accessed HealthSmart's network, including Columbia Hospital, through the Network Cross Access Agreement.

No. 20-20032

## B.    Claim reimbursement dispute

This dispute arises from Columbia Hospital's attempt to collect over $2.7 million for T.S.'s surgeries, including inpatient care and implants in his back and spine.  Columbia Hospital's "billed charges" were $1,165,116.80 for the first surgery and $1,548,885.57 for the second surgery, totaling $2,714.002.37.  IMA at first declined to pay and requested further records to explain the cost of the implants.  In October 2016, HCA's senior counsel sent a letter on behalf of Columbia Hospital to HealthSmart related to these unreimbursed claims "pursuant to [Columbia Hospital's] agreement with HealthSmart."   This letter further sought "HealthSmart's position regarding [IMA's] refusal to process or pay claims until and unless the facility provides cost invoicing for implants," and stated that "[a]ction must be taken to address the existing gap in understanding between [HealthSmart's] client and the facilities who serve their members."  A copy of this letter was sent to IMA's legal department.

In March 2018, IMA subsequently paid Columbia Hospital $1,014,161.97.  This payment did not cover any of the costs of the implants—totaling an additional $1,361,786.46—which IMA deemed "ineligible" and "exceed[ing] the maximum allowed based on the reasonable and customary amount" under its plan.  For the services IMA did reimburse, it paid a discounted amount of 75% of the billed costs.  Specifically, IMA's explanation of benefits indicated that the discount code, "2226," was pursuant to the "PPO Plus/HealthSmart/PHCS/1st Health . . . discount."  This discount rate matches the discount stated in Exhibit B of the Hospital Agreement for the "stop loss" provision of 75% of billed costs.  Columbia Hospital maintains, however, that IMA was required to further reimburse it for the implants, at the same 75% discounted rate, totaling an additional $1,021,339.85.

No. 20-20032

### C.    Procedural history

In July 2019, Columbia Hospital filed a demand for arbitration against IMA in Houston, Texas, alleging breach of contract for the unreimbursed amount of T.S.'s surgery implants.  In response, IMA initiated this lawsuit in the Southern District of Texas seeking declaratory and injunctive relief that it is not obligated to arbitrate the dispute because it is not a signatory to the Hospital Agreement and that it is not obligated to pay the disputed amount.

Columbia Hospital moved to stay the district court proceedings and compel arbitration.  It argued that IMA was bound by the 2012 arbitration clause in the Hospital Agreement because the series of agreements between Columbia Hospital, HealthSmart, PPOplus, and IMA form a "single, unified contract."  Alternatively, Columbia Hospital argued that even as a non-signatory to the Hospital Agreement, IMA was bound by the arbitration clause because it knowingly received the benefits of the discounted services provided in the agreement.

The district court disagreed on both grounds and denied the motion to compel arbitration.  *IMA, Inc. v. Columbia Hosp. Med. City at Dallas, Subsidiary, L.P.*, No. CV H-19-3500, 2019 WL 7168099, at *4 (S.D. Tex. Dec. 23, 2019).  Columbia Hospital timely appealed.

## II.

A district court's denial of a motion to compel arbitration is reviewed de novo. *Bowles v. OneMain Fin. Grp., L.L.C.*, 954 F.3d 722, 725 (5th Cir. 2020).  We review the district court's findings of fact for clear error.

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 256 (5th Cir. 2014).

The district court's application of direct benefits estoppel is reviewed for an abuse of discretion. *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472–73 (5th Cir. 2010). "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous.'" *Id.* at 473 (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)).

## III.

Whether IMA is compelled to arbitrate this reimbursement dispute turns on the threshold question of "whether the parties entered into any arbitration agreement at all." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis omitted); *see also Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) ("[B]ecause arbitration is a matter of contract, where a party contends that it has not signed any agreement to arbitrate, the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration."). If no arbitration contract between IMA and Columbia Hospital was formed, we need not consider whether the scope of the arbitration agreement includes the disputed reimbursement claim. *Cf. Tittle v. Enron Corp.*, 463 F.3d 410, 419 (5th Cir. 2006) (determining scope of arbitration clause only because there was no dispute that the parties were subject to a valid arbitration agreement).

We apply "ordinary state-law principles that govern the formation of contracts" to determine whether an arbitration contract was formed. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Likewise, whether a party can compel a non-signatory to arbitrate on equitable grounds

is determined by state law. *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 261 (5th Cir. 2014) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)). The parties do not dispute that Texas law applies here. The "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir.), *opinion supplemented on denial of reh'g*, 303 F.3d 570 (5th Cir. 2002).

"In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 353 (5th Cir. 2003). "Arbitration agreements apply to nonsignatories only in rare circumstances." *Id.* at 358. While it is undisputed that IMA is not a party or signatory to the Hospital Agreement that contains the arbitration clause, Columbia Hospital argues that IMA is nonetheless required to arbitrate under direct benefits estoppel, or alternatively under a unified contract theory.

## A.    Direct benefits estoppel

Direct benefits estoppel applies to "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006) (internal quotation marks and citation omitted). Texas's application of direct benefits estoppel is consistent with federal law. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 134–35 (Tex. 2005).

"A non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract."

*Noble Drilling*, 620 F.3d at 473.[4] Columbia Hospital asserts only that the first ground applies here. Accordingly, "[t]o invoke direct-benefits estoppel under this theory . . . [IMA] must have known about the existence of the contract and its terms, and acted to exploit that contract. Second, [IMA] must have obtained some benefit under the contract." *In re Lloyd's Reg. N. Am., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015) (citing *Noble Drilling*, 620 F.3d at 473–74).

The district court declined to apply direct benefits estoppel because it determined that, factually, Columbia Hospital "failed to show that IMA had knowledge of the existence and terms, including the arbitration provision, of the Hospital [Agreement]." *IMA, Inc.*, 2019 WL 7168099, at *3. It emphasized that in order to comply with its obligations, IMA needed only "a copy of the Plan and the PPO Contracted Rates," the latter of which were contained in "an attachment to the relevant contract, and are not set forth in the contracts themselves." *Id.* Because the district court concluded that IMA was not shown to have the requisite knowledge of the Hospital Agreement, it did not reach the second issue of whether IMA obtained "direct benefits" from the Hospital Agreement.

---

[4] While not dispositive, "the archetypal direct-benefits case" applies where "the party opposing arbitration seeks to enforce the terms of an agreement with an arbitration clause." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 637 (Tex. 2018) (citing *Rachal v. Reitz*, 403 S.W.3d 840, 847 (Tex. 2013)); *see also Bridas*, 345 F.3d at 362 (noting "an important distinction . . . between cases where the courts seriously consider applying direct benefits estoppel" is whether the "nonsignatory had brought suit against a signatory premised in part upon the agreement."); Scott M. McElhaney, *Enforcing and Avoiding Arbitration Clauses Under Texas Law*, 37 Corp. Couns. Rev. 109, 139 (2018) ("In situation[s] in which signatories seek to compel arbitration of the claims they assert against non-signatories . . . principles of estoppel have not been as successful.").

**1.**

Columbia Hospital first argues that the district court legally erred, and thereby abused its discretion, by requiring that IMA have specific knowledge of the arbitration provision for direct benefits estoppel to apply, when it is sufficient that a "non-signatory have had actual knowledge of the *contract* containing the arbitration clause." *Noble Drilling*, 620 F.3d at 473 (emphasis added). Not so. The district court correctly applied our circuit's precedent that knowledge of the agreement requires knowledge of the contract's "basic terms." *See In re Lloyd's Reg.*, 780 F.3d at 292.

Columbia Hospital relies on *Vloeibare Pret Ltd. v. Lloyd's Register North America, Inc.*, in which we applied direct benefits estoppel over the non-signatory party's objection that it was "unaware" of a specific forum selection clause within a contract. 606 F. App'x 782, 785 (5th Cir. 2015) (per curiam) (unpublished). In that case, we held that it was sufficient that the non-signatory was "aware both of the existence of the . . . contract and its basic terms" because its complaint referenced the contract and "outlined extensively the obligations that [the signatory defendant] had under the contract." *Id. Vloeibare* is consistent with the district court's application of direct benefits estoppel here, as the district court concluded that IMA lacked knowledge of the "existence and terms, *including* the arbitration provision, of the Hospital [Agreement]." *IMA, Inc.*, 2019 WL 7168099, at *3 (emphasis added). The district court did not apply a heightened knowledge requirement.

**2.**

Columbia Hospital next argues that the district court clearly erred factually in concluding that IMA lacked knowledge of the basic terms of the

Hospital Agreement.[5] The crux of the district court's decision was that IMA neither was shown to have, nor needed, knowledge of the Hospital Agreement in order to fulfill its obligations to the Health Plan and the IMA-PPOplus Agreement; rather IMA could process the claims with "a copy of the [Health] Plan and the PPO Contract Rates." *Id.* Consequently, the district court declined to infer that IMA's partial reimbursement to Columbia Hospital showed knowledge of the underlying Hospital Agreement or its terms. *Id.*

Columbia Hospital asserts that the district court clearly erred because it ignored the record evidence showing that IMA preauthorized T.S.'s surgeries and subsequently reimbursed Columbia Hospital, in part, at the discounted rates. To constitute an abuse of discretion, the district court's evaluation of the evidence must be "premised . . . on an assessment of the evidence that is clearly erroneous." *Noble Drilling*, 620 F.3d at 472–73.

First, Columbia Hospital says that IMA knew about the Hospital Agreement when it twice preauthorized T.S.'s surgeries as in-network services because such authorization "presupposes the existence of the Hospital Agreement." The record is sparse as to what this preauthorization entails or the significance of IMA's "authorization numbers." The parties agree that IMA's preauthorization at a minimum confirmed that T.S. was a member of the Health Plan and that Columbia Hospital was an in-network, preferred services provider. But nothing in the record establishes that this preauthorization "presupposes" knowledge of the Hospital Agreement, let

---

[5] We reject Columbia Hospital's contention that the district court *legally* erred by concluding that IMA's knowledge of the discount terms was insufficient to constitute knowledge of the Hospital Agreement and its basic terms. Whether IMA knew of the discount terms attached to the Hospital Agreement is a *factual* determination, which we review for clear error. *Noble Drilling*, 602 F.3d at 472–73.

alone its discount terms, beyond a generalized relationship between T.S.'s health plan and the PPO network. *See Noble Drilling*, 620 F.3d at 473; *see also Pershing, L.L.C. v. Bevis*, 606 F. App'x 754, 758 (5th Cir. 2015) (per curiam) (unpublished) ("A nonsignatory must have specific knowledge of the relevant agreement—a nonsignatory's generalized sense that two contracting parties have a course of dealing will not satisfy this requirement."). Consequently, the district court did not clearly err in declining to rely on the authorization numbers as evidence that IMA had knowledge of the Hospital Agreement and its basic terms.

Second, Columbia Hospital asserts that IMA knew the basic terms of the Hospital Agreement when, in March 2018, it partially reimbursed Columbia Hospital at the agreed-upon discounted rate. Specifically, Columbia Hospital argues that IMA even referenced the "PPOplus/HealthSmart" discount in its payment explanation.

IMA counters that its network providers—PPOplus, who in turn contracted with HealthSmart—reprice the claims. In support, IMA points to a declaration from its VP of Operations stating that "IMA does not receive a copy of the agreements with the hospitals or other providers" and that "IMA does not know the discount amount until after it has been repriced by the PPO."

Based on this record, the district court did not clearly err in relying on IMA's declaration to conclude that "[t]here is no reason IMA would need to know the terms of the Hospital [Agreement], and there is no evidence that it knew those terms." *IMA, Inc.*, 2019 WL 7168099, at *3. Additionally, the discount code that Columbia Hospital principally relies on refers to three other PPO networks in addition to PPOplus and HealthSmart, which is further indicative of the parties' participation in various network arrangements rather than knowledge of one specific agreement.

Alternatively, Columbia Hospital argues that IMA knew of the Hospital Agreement upon receipt of the October 2016 demand letter, which quoted various provisions of the Hospital Agreement including the applicable discount rates. Specifically, the letter excerpted two lines from the Hospital Agreement's Exhibit B, including the discounted 75% "stop loss" provision that IMA subsequently applied in its partial payment to Columbia Hospital. Notably, this letter was addressed to HealthSmart (which similarly did not have a direct contract with IMA), sought HealthSmart's position regarding IMA's "refusal to process or pay claims," and did not seek a response or other action from IMA.

The district court noted that this letter "fail[ed] to present evidence that IMA knew the *arbitration terms* of the Hospital [Agreement]," *IMA, Inc.*, 2019 WL 7168099, at *3 n.4 (emphasis added), but the district court did not address whether this letter established that IMA then knew of the Hospital Agreement's existence or its basic terms. *See In re Lloyd's Reg.*, 780 F.3d at 292; *Vloeibare*, 606 F. App'x at 785. Nonetheless, the record does not show that the district court clearly erred in concluding that IMA could comply with its payment obligations at the discounted rates contained in the Hospital Agreement by relying on the PPO networks, including PPOplus and Healthsmart, to apply the agreed-upon discounts.

Consequently, the district court did not clearly err in concluding, based on the record before it, that IMA lacked the requisite knowledge of the Hospital Agreement and its basic terms to be compelled to arbitrate under direct benefits estoppel.[6]

---

[6] Like the district court, we do not reach the second direct benefits estoppel inquiry of whether IMA directly benefitted from the contract. *See In re Lloyd's Reg.*, 780 F.3d at 292; *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 351, 353 (2d Cir. 1999) (concluding, where it was undisputed that all parties had knowledge of the

No. 20-20032

## B.     Unified contract

Alternatively, Columbia Hospital argues that IMA is bound by the arbitration clause in the Hospital Agreement because the series of contracts between IMA, PPOplus, HealthSmart, and Columbia Hospital—which together "created this preferred-provider network"—should be construed as a single, unified contract.

Under Texas law, "instruments pertaining to the same transaction may be read together to ascertain the parties' intent." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). This can apply "even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Id.* In such circumstances, "courts may construe all the documents as if they were part of a single, unified instrument." *Id.* However, the Texas Supreme Court has repeatedly cautioned that "tethering documents to each other is 'simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation.'" *Rieder v. Woods*, 603 S.W.3d 86, 94–95 (Tex. 2020) (quoting *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959)).

The district court declined to construe the agreements as a single, unified contract because they each contained "Entire Agreement" provisions.[7] On appeal, Columbia Hospital asserts that these provisions do not bar construing the contracts together because "the agreements at issue repeatedly cross-reference each other." We review the district court's legal

---

contract containing an arbitration clause, that the non-signatories directly benefitted from that contract, and were thus bound to arbitrate).

[7] An "entire-agreement clause" is also commonly termed an "entire-contract clause," "integration clause," or "merger clause." BLACK'S LAW DICTIONARY (11th ed. 2019).

determinations de novo and factual findings for clear error. *Bowles*, 954 F.3d at 725; *Crawford*, 748 F.3d at 256.

Both the Hospital Agreement and the IMA-PPOplus Agreement contain similar "Entire Agreement" provisions.[8] Texas law recognizes such clauses as "contractual provision[s] stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." *Rieder*, 603 S.W.3d at 96 (quoting *Integration (Merger) Clause*, Black's Law Dictionary (11th ed. 2019)).

The Hospital Agreement, entered nearly a decade after the IMA-PPOplus Agreement, does not expressly reference IMA or the IMA-PPOplus Agreement. However, it does contemplate that a "Group," including a "third party administrator," like IMA, would be subject to the Hospital Agreement and its arbitration provision. Additionally, a "Group Agreement" is defined as any agreement "directly or indirectly, between [HealthSmart] and a Group." Contrary to the district court's conclusion,

---

[8] The Hospital Agreement states:

Entire Agreement: This Agreement, all Exhibits, and other documents furnished pursuant to or in furtherance of this agreement and expressly made a part hereof shall constitute the entire agreement relating to the subject matter hereof between the parties hereto. Each party acknowledges that no representation, inducement, promise or agreement has been made, orally or otherwise, by the other party, or anyone acting on behalf of the other party, unless such representation, inducement, promise, or agreement is embodied in this Agreement, expressly, or by incorporation.

The IMA-PPOplus Agreement states:

Entire Agreement: This Agreement and all attachments and other documents furnished pursuant to this Agreement and expressly made a part hereof shall constitute the entire Agreement relating to the subject matter hereof between the parties hereto.

this indicates that IMA (a "Group") and the IMA-PPOplus Agreement (a "Group Agreement") *are* incorporated into the Hospital Agreement, and thus not barred by its merger clause.

The converse—that the 2003 IMA-PPOplus Agreement similarly incorporates the entirety of the 2012 Hospital Agreement—is not true. While IMA agreed to "pay claims of Participating Providers in accordance with the applicable Plan and the PPO Contracted Rates," which means the "rates or fees agreed upon by PPO and Participating Provider," the IMA-PPOplus Agreement does not incorporate all of the other, non-payment terms in those agreements.[9]

Columbia Hospital argues that we disregard IMA's contractual language because the agreements "repeatedly cross-reference each other." It is true that the IMA-PPOplus Agreement contemplates other "Provider Agreements"—defined as "any agreement for the provision of Covered Services to Beneficiaries that is entered . . . indirectly with an entity representing such Participating Provider"—including contracts like the Hospital Agreement, which IMA entered indirectly through the Network Cross Access Agreement. We agree with IMA, however, that IMA "never

---

[9] Columbia Hospital passingly refers to a 2013 provision of the Texas Insurance Code which Columbia Hospital says prohibits PPO networks—here, HealthSmart and PPOplus—from providing an entity with "access to health care services or contractual discounts under a provider network contract unless the provider network contract specifically states that the person must comply with all applicable terms, limitations, and conditions of the provider network contract." TEX. INS. CODE § 1458.102(a). Columbia Hospital did not raise this argument before the district court, nor does it explain on appeal how this provision applies, if at all, to third-party administrators like IMA, or to the agreements at issue here, all of which predate the 2013 statute. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999) ("This Court will not consider an issue that a party fails to raise in the district court absent extraordinary circumstances."); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

agreed to comply with or be a party to the 'Provider Agreements.'"  This distinction is critical.  Moreover, the IMA-PPO Plus Agreement discusses "Provider Agreements" only in reference to the obligations imposed on PPOplus, not IMA.  Instead, the IMA-PPOplus Agreement emphasizes IMA's obligations to pay the "PPO Contracted Rates," *without* referencing the more expansive obligations of any individual Provider Agreement.[10]

Contrary to Columbia Health's assertions, these obligations are not co-extensive.  Consequently, like the district court, we decline to construe these agreements as a unified contract.  *See Reider*, 603 S.W.3d at 94–95.[11]

## IV.

For the foregoing reasons, the district court's denial of Columbia Hospital's motion to compel arbitration is AFFIRMED.

---

[10] By contrast, the Hospital Agreement requires "any Group accessing [Columbia Hospital]'s rates under this Agreement is contractually bound to [Columbia Hospital] to adhere *to the terms and conditions of this Agreement*."

[11] Because we conclude that the contracts cannot be construed together as a single, unified contract, we need not consider the district court's alternative holding that the agreements can be deemed unified for reimbursement purposes but not to compel arbitration.  *IMA, Inc.*, 2019 WL 7168099, at *3 (citing *Baylor Univ. Med. Ctr. v. Nippon Life Ins. Co.*, No. CIV.A.3:09CV1496L, 2010 WL 330238, at *4 (N.D. Tex. Jan. 28, 2010)).